STATE OF NORTH CAROLINA v. JOHNNIE L. HARRINGTON

No. 441PA92

(Filed 5 November 1993)

1. **Criminal Law §§ 481, 540 (NCI4th)— juror's statement to other jurors—failure to hold hearing—replacement of juror because he overheard something about case**

    The trial court did not err in failing to conduct a hearing to question a juror whom the courtroom clerk overheard tell two other jurors he did not believe a defense witness and then in replacing the juror prior to deliberations without prior consultation with defendant because the juror had informed the court that he had "overheard something about the case" where the court asked the other jurors if any had overheard anything about the case and none responded; the trial court thus acted within its discretion in not excusing any other jurors; the trial court's excusal of the juror was favorable to defendant since whatever he had overheard about the case could conceivably have affected his impartiality; the defense witness about whom the juror spoke was a minor corroborative witness, and the juror's questioning of this evidence could not have prejudiced defendant; and the trial court acted within its discretion under N.C.G.S. § 15A-1215(a) by replacing the juror to avoid any suspicion about his ability to be fair and impartial.

    **Am Jur 2d, Trial §§ 1544, 1610, 1637.**

    **Propriety and effect of jurors' discussion of evidence among themselves before final submission of criminal case. 21 ALR4th 444.**

2. **Constitutional Law § 342 (NCI4th)— ex parte conversation between court and juror—absence of prejudice**

    While the trial court's reference to "something you told me earlier" in its remarks to a juror in this noncapital trial indicates that an *ex parte* conversation between the court and the juror did occur, this conversation out of defendant's presence could not have influenced the verdict and was not prejudicial to defendant where the record establishes that the substance of the conversation related to the juror's having "overheard something about the case"; the court removed the

STATE v. HARRINGTON

[335 N.C. 105 (1993)]

juror prior to deliberations to avoid suspicion about his ability to be fair and impartial; and no juror responded when the trial court asked if any juror had overheard anything about the case.

**Am Jur 2d, Trial §§ 1579, 1637.**

**Prejudicial effect, in civil case, of communications between court officials or attendants and jurors. 41 ALR2d 288.**

3. **Criminal Law § 738 (NCI4th)— statement by court—unusual amount of evidence on one side—no expression of opinion**

The trial court did not express an opinion on the weight of the evidence by its statement that "it is unusual for us to hear so much evidence on one side" when the statement is considered in context where the court was admonishing the jurors pursuant to N.C.G.S. § 15A-1236(a)(3) to maintain an open mind until they conducted their deliberations, and the statement occurred during instructions that the jurors should resist their natural impulses to reach preliminary conclusions based on the quantity of evidence presented by the opening side and that it was the duty of jurors to hear evidence from both sides and to discuss the case among themselves before reaching a conclusion.

**Am Jur 2d, Trial § 1573.**

4. **Criminal Law § 865 (NCI4th)— instructions on unanimous verdict and reasoning together—no invasion of province of jury or violation of free speech**

The trial court did not invade the province of the jury or violate the jurors' free speech rights by instructing the jury that "it is important that you not go to the jury room and immediately take a vote or immediately stake yourself out on a strong position" where the court was instructing the jury, in accordance with N.C.G.S. § 15A-1235, that the jurors must be unanimous in order to return a verdict, that they have a duty to consult and deliberate, that they should try to reach agreement but only if this can be accomplished without violating any member's convictions, and that they should keep an open mind in the process.

**Am Jur 2d, Trial §§ 1188, 1451.**

## STATE v. HARRINGTON

[335 N.C. 105 (1993)]

On certiorari to review judgments of imprisonment entered by Long, J., at the 10 February 1986 Criminal Session of Superior Court, Lee County, upon jury verdicts finding defendant guilty of first-degree sexual offense and first-degree kidnapping. Heard in the Supreme Court 16 September 1993.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*Cunningham, Dedmond, Petersen & Smith, by Bruce T. Cunningham, Jr. and F. Marsh Smith, for defendant-appellant.*

WHICHARD, Justice.

Defendant, Johnnie Harrington, was indicted on one count each of sexual offense, rape, and kidnapping. He was found guilty of first-degree kidnapping and first-degree sexual offense and not guilty of rape. The trial court sentenced him to life imprisonment for the sexual offense and a concurrent twelve years imprisonment for the kidnapping. On 15 February 1993 this Court, recognizing that defendant had not had a direct appeal from the judgments entered upon his convictions, allowed defendant's petition for certiorari. We now conclude that defendant received a fair trial, free of prejudicial error.

The evidence presented at trial tended to show the following:

The victim is defendant's first cousin. She moved from New York City to Cameron, North Carolina in July 1984 to live with her aunt, Lucy Johnson. On 17 August 1985 defendant's wife, Jennie Harrington, invited the victim to visit their home in Sanford. Defendant was thirty-five years old at the time; the victim was sixteen. On 18 August around 2:00 p.m., Jennie met the victim at her Aunt Lucy's home, left Jennie's daughter Tomika in Lucy's care for the day, and drove the victim to Sanford. They arrived at defendant's home around 3:00 p.m.

Soon thereafter, defendant arrived. Jennie was in the kitchen preparing a meal, and the victim was sitting in the den. After a period of conversation, defendant and Jennie went to their bedroom in the rear of the house. Defendant soon returned to the den. He told the victim that Jennie had something to tell her in the bedroom and to "be good and be nice." In the bedroom, the victim found Jennie looking upset. Jennie said it was not the victim's fault. The victim could tell something was wrong. Jennie asked

STATE v. HARRINGTON

[335 N.C. 105 (1993)]

the victim, "Did he tell you yet?" Defendant then came into the room briefly and suggested that the victim put on some fingernail polish. He left the room. Jennie asked the victim to put on a negligee. After initially declining, the victim obliged. She testified that she did so only to show Jennie briefly how it looked. While the victim was in the adjacent bathroom putting on nail polish and wearing the negligee, defendant again entered the bedroom. He had changed into a robe and bikini underwear.

The victim tried to cover herself with her shirt. Defendant struggled with her to remove the shirt. She then went to sit on the bed because she felt sick. Defendant tried to get on top of her, but she pushed him off. Defendant then slapped her several times and tried to force her into the spare bedroom. He threatened to kill her. Back in the bedroom again, she noticed defendant had a gun. Defendant asked, "Oh, you scared of this?" He fired the gun twice toward the floor, once near the bathroom door and once as he walked out of the bedroom. Jennie told the victim just to do everything she did.

Defendant returned to the bedroom holding the gun and a smoking pipe containing marijuana. After the three of them smoked from the pipe, defendant told the victim and Jennie to get on their knees. He removed his underwear and told the victim to perform oral sex on him. When she refused, he directed Jennie to demonstrate the act. Defendant then placed the gun at the victim's head and forced her to perform oral sex on him. After defendant had consensual sexual intercourse with Jennie, he had sexual intercourse with the victim. Defendant continued to hold the gun in his hand. He again had sexual intercourse with each woman. The victim testified she did not consent to any of these sexual acts.

During the course of these events, the victim twice left the bedroom, saying she needed a cigarette. She testified she did not try to escape because (1) she was scared, (2) she had no money, (3) she was wearing only a negligee and underclothes, (4) she did not know how to get back to Cameron, and (5) defendant had threatened to kill her.

The victim, Jennie, and defendant returned to the den where defendant showed a pornographic movie on the television. The victim only "glanced" at it, and she began to offer excuses as to why she needed to return home.

Jennie drove the victim home around 11:00 p.m., stopping at McDonald's to get her dinner. They did not discuss what had happened. After arriving at home, the victim did not speak to anyone and went outside to eat her meal. Lucy Johnson testified that the victim was not in her usual "jolly and happy" mood. She looked sad, and her face was "puffy." She looked like something was wrong, and her eyes "looked like she had been crying." When Lucy asked the victim if everything was all right, Jennie answered for her, assuring Lucy the victim was "fine." The victim walked with Jennie and her daughter Tomika to Jennie's car. Jennie told the victim, "I'm sorry. This will never happen again. Please don't tell, or we could go to jail."

The victim did not tell anyone about the incident until very late the evening of 19 August when she told her cousin, Michele Johnson, "Johnnie raped me." She then recounted the events of the evening in question to Michele. Michele's testimony corroborated the victim's, with minor additions. She stated that defendant had told the victim soon after he arrived home that afternoon that the spare bedroom could be hers if she would "just do what [he said] and listen to [him]." Michele also testified that after defendant fired the second gun shot, Jennie told the victim, "I'm sorry. This will never happen again. Just do what I do; that's all." Michele also stated that when defendant was forcing the victim to perform oral sex on him, he held the gun over her head and told her she had "better do it right or else." Michele and the victim then woke up their aunt, Lucy Johnson, and told her what had happened. Lucy called the police.

Detective Kevin Gray testified that he took the victim's statement the next morning, 20 August. He re-read the statement to her several times for her verification. She swore to its accuracy before a magistrate. Her statement was consistent with her court testimony with slight variation. She stated defendant had pointed the gun at her twice. She also stated that defendant told her before she left the house that if she "got pregnant to call Jennie to arrange an abortion."

Gray also testified that he and a colleague went to defendant's home on 20 August. He identified three bullet holes in defendant's bedroom floor. Two of the holes were very similar. Gray suggested they were made by a gun about the size of a .38 caliber. One

of the holes was near the bathroom door, and the other was near the bedroom entrance.

Detective Ray Garner testified that he accompanied Gray to defendant's home. He identified State's Exhibit 1 as the .38 caliber pistol he found in the home.

Defendant's testimony varied greatly from the evidence presented by the State. He first testified that one night in 1984 he drove the victim back to Cameron from Pinehurst, where they had checked their grandmother into the Moore County Hospital. He stopped at a convenience store to buy beer which he and the victim drank. The victim then approached defendant and performed unsolicited oral sex on him while he drove. On her cross-examination earlier in the trial, the victim had denied that this happened, saying defendant was lying if he said it did.

Defendant testified that when he returned to his home on 18 August 1985, having been out drinking, he was surprised to see the victim there. Because he and Jennie had argued about his drinking problem that morning, he went to see Jennie in the bedroom to try to make amends. She would not talk to him. He and the victim drank in the den and smoked marijuana on the patio. He asked the victim for a "repeat performance" of that night in 1984, but the victim said she was worried about what Jennie would do if she did that. Defendant and the victim then agreed to watch a pornographic movie. Jennie testified she was watching television in the bedroom during this time.

Defendant then went to the bedroom and told Jennie he wanted her and the victim to "get pretty" and just do what he said. He returned to the den and told the victim to go to the bedroom because Jennie had "something she want[ed] to tell [her]." When he later entered the bedroom in his robe and underwear, he saw the victim sitting on a footstool at the foot of the bed dressed in a "nightie" and Jennie sitting in the bathroom in her "nightie."

When Jennie refused to come out of the bathroom, defendant testified he took Jennie's .38 special out of her dresser drawer. He identified State's Exhibit 1 as that gun. He fired the gun at the floor while standing outside the bathroom. At this point the victim still sat on the stool behind him. He testified that he did not look at her, point the gun at her, or direct any conversation at her. He yelled at Jennie and left the room, firing another shot at the floor.

STATE v. HARRINGTON

[335 N.C. 105 (1993)]

After he returned with the gun and the three of them had smoked marijuana, defendant told Jennie, "[the victim] and I have got something to show you." He asked the victim to come over and show Jennie a "repeat performance." He had the gun in his hand. The victim came over to him, removed his underwear, and performed oral sex on him. Defendant then laid back on the bed and had Jennie call his supervisor to say he was too sick to work.

Jennie and the victim left. Defendant denied ever threatening the victim, hitting her, or forcing her to do anything the entire evening, with or without a weapon.

On cross-examination, defendant testified that he had several beers and numerous gin drinks during the hours leading up to the alleged acts. He admitted he had a drinking problem and that drinking and smoking marijuana sometimes affected his memory. Defendant also testified that between midnight Friday and the time the victim left his house Sunday evening he had only about two hours of sleep. Much of this time was spent drinking alcohol with friends. He had to leave his Saturday night work shift early because he was sick from drinking. He admitted there was a lot said on 18 August that he did not remember.

Defendant denied having sexual intercourse with his wife or the victim. He acknowledged that he was convicted in 1976 of the felonies of breaking and entering the residence of a woman and of assaulting her when inside.

Jennie Harrington testified that she invited the victim over "just to spend some time with her, have her company." She called the victim after her argument with defendant on Saturday and did not tell defendant she had done so.

Jennie generally corroborated defendant's account of the events of 18 August. She also testified to additional material facts. She had not known defendant wanted her to "get pretty" prior to his asking her to do so, but because defendant had asked her to do this in the past, she knew what he meant. The victim did not object when asked to put on the negligee; she simply went to the bathroom to put it on. When the victim performed oral sex on defendant, Jennie was "shocked and ashamed" because she had never seen defendant act like that before. Afterward, she was mad and "hated both of them."

On the way to the victim's home, she and the victim did not have a conversation because she was so mad. They stopped at McDonald's, where she had a brief conversation with Reginald Williams, a friend of defendant.

At Lucy's home, she did not answer for the victim when Lucy inquired about her. The victim answered for herself. When the victim walked Jennie to the car, Jennie told her she would "get [her] for what happened." The victim tried to hug Jennie, but Jennie did not hug back.

On cross-examination, Jennie testified that she "didn't completely ignore" the victim after inviting her over to spend time with her. Although she left the victim in the den with defendant for a long period of time, she did once invite her to the bedroom to watch television.

She testified that even though defendant's actions were "so unusual" and though he had never before walked around with a gun following an argument, she was "not really" afraid. She was just nervous. She knew him well enough to know he would not use the gun on her or the victim. She said he had it "just to let us know he meant business." She told the prosecutor she did not worry about what was going on because she did not know what was going on. She said it all happened so fast she did not have time to think about it. At the prosecutor's suggestion, she then acknowledged that thirty minutes passed between the time defendant asked her to "get pretty" and the time defendant entered the bedroom in his robe and underwear. She then "guess[ed]" she did have time to think about it but just did not.

Only when the victim performed oral sex on defendant did Jennie know what was going on. She did not say anything when the victim performed this act. She did not try to stop it even though she had not seen anything like it before. She testified she has not asked defendant about it since.

Reginald Williams testified that he saw Jennie at McDonald's that evening. She and the victim were alone in the car.

Detective Gray testified that he made every reasonable effort on 20 August to insure the accuracy of the victim's statement before reducing it to its final form. The statement said that Jennie and defendant both drove the victim home.

STATE v. HARRINGTON

[335 N.C. 105 (1993)]

Lucy Johnson again testified for the State in rebuttal. She stated that on the evening in 1984 that defendant testified to, she received a telephone call at home at 11:00 p.m. She was told defendant and the victim had left Pinehurst. They arrived in Cameron at 11:20 p.m. even though it takes twenty-five to thirty minutes to complete that drive by either available route. She also testified that the convenience stores between Pinehurst and Cameron are closed after 11:00 p.m. She smelled no alcohol on the victim's breath when the victim returned home that evening.

On cross-examination, Lucy testified she had not driven from the Moore County Hospital to Cameron since 1978, but she still rode that route often. She had driven on it since 1978. When she did so, she often looked for an open store late at night where she could buy gas.

[1]  First, defendant contends the trial court erred in not conducting a hearing to question a juror whom the courtroom clerk overheard tell two other jurors he did not believe a defense witness and then in excusing the juror without prior consultation with defendant. We disagree.

After the close of all the evidence, an exchange occurred in chambers. Those present were Mr. O'Hale, an Assistant District Attorney; Mr. Kinnaman, defense counsel; the court reporter; and Cynthia Myers, an assistant clerk. The exchange was as follows:

MR. O'HALE: The Clerk just told me as the jurors were leaving, she was downstairs, she heard one of the jurors make a comment, I believe, about Reginald Williams' testimony.

THE CLERK: He didn't say the name.

MR. O'HALE: And I would just rather she say exactly— this is Cynthia Myers, the clerk in the courtroom, and has been in the courtroom during the trial. ·

THE COURT: This is as the jurors were leaving the courthouse?

THE CLERK: As they were going down the ·stairs. He was saying something to two other men. The lady behind him said "You'd better be quiet. You're not supposed to be talking." Got down the steps and stopped and he was saying, "I believe when you take that Bible in your hand you are supposed to be telling the truth and I don't think that young boy was

telling the truth. When I take the Bible in my hand—" he laughed. He said, "I think I'll tell the judge tomorrow."

THE COURT: He said what?

THE CLERK: He said, "I think I'll tell the judge tomorrow."

THE COURT: Do you remember what he looked like? Do you remember which juror it was?

THE CLERK: Joseph Brown, third gentleman on the back row with the blue shirt on. And when you and all the attorneys were at the bench the last few minutes, he was whispering at one of the other juro[r]s and looking at Mr. Harrington.

MR. O'HALE: But you don't know what he said?

THE CLERK: I don't know what he said.

MR. KINNAMAN: When he made that comment, who was present in his earshot?

[THE] CLERK: All the jurors were going down the stairs. There were two men he was talking to. Whether they were jurors or not, I don't—I think they were. It shocked me. I didn't pay any attention to them.

THE COURT: All right. Is that all you heard?

THE CLERK: Yes.

THE COURT: Okay.

THE CLERK: And I'm not sure he was talking about Williams, but that is who I think—

THE COURT: But he said young man?

THE CLERK: Young man.

. . . .

THE COURT: Let's go ahead and hold the charge conference, and if any motions [come] as a result of this in any way, we will take those when they come.

Neither counsel made a motion for a hearing or requested any further inquiry. The only other time juror Brown was discussed was just before the trial court dismissed the jury to deliberate. The court stated:

It is natural that some person may have said something to you which could possibly influence your decision. It is possible that you may have read something about the matter in the paper or overheard someone who has read something about it in the paper, and I would ask at this time if there are any jurors who have any matters of that nature to report to the Court.

When none responded, the court continued:

Now, I understand, Mr. Brown, from something you told me earlier, that you overheard something about the case. You feel like you could render a fair decision and that wouldn't influence you, but you wanted the Court to know about that. Are there any others? All right.

Despite the fact that I believe you, in confidence, could render a fair and impartial verdict, since no others have any such matters to report and in keeping with your desire to be open and honest about it and in keeping with our desire that no one should be suspicious of your ability to do what you think you can do, we will allow you to step down rather than the 13th juror and place him in your seat.

The court dismissed Juror Brown. It asked counsel to offer any objections, but none were made.

Defendant argues that *State v. Drake*, 31 N.C. App. 187, 229 S.E.2d 51 (1976), requires the conclusion that the trial court abused its discretion. *Drake*, he contends, gives the court an affirmative duty to hold a hearing to investigate juror misconduct and to allow a defendant to participate in that hearing.

*Drake* does not prescribe this as an absolute rule, however. The Court of Appeals there stated that "where instructions fail to prevent alleged [juror] misconduct, an investigation *may* be required." *Drake*, 31 N.C. App. at 191, 229 S.E.2d at 54 (emphasis added). An examination is "generally" required only "where some prejudicial content is reported." *Id.* at 192, 229 S.E.2d at 54.

Nothing in the record compels the conclusion that juror Brown's statements were prejudicial to defendant. The court asked the jurors if any had overheard anything about the case. None responded. Under these circumstances, the trial court clearly acted within its discretion in not excusing any jurors other than Brown. "The

determination and effect of jury misconduct is primarily for the trial court whose decision will be given great weight on appeal." *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991).

As to juror Brown, the court dismissed him. Given that he had overheard something about the case that conceivably could have affected his impartiality, this action was favorable to defendant. Defendant has not argued, and the record does not reflect, any possible prejudice to defendant from the alternate juror's sitting in the place of juror Brown.

Finally, the defense witness about whom juror Brown spoke, Reginald Williams, was a minor witness. His testimony served only to corroborate that Jennie Harrington was the only person who drove the victim home. Through this testimony, defendant tried to impeach the victim's credibility, in that her sworn statement indicated that both Jennie Harrington and defendant had driven her home. Considering the State's evidence as a whole, juror Brown's calling this evidence into question could not have prejudiced defendant.

Had prejudicial conduct occurred, "*any* appropriate action by the trial court" would have been warranted. *Drake*, 31 N.C. App. at 191, 229 S.E.2d at 54 (emphasis added). The trial court may remove a sitting juror and seat an alternative juror "before final submission of the case to the jury" if a juror "becomes incapacitated or disqualified, or is discharged for any other reason." N.C.G.S. § 15A-1215(a) (1988). The trial court removed juror Brown "in keeping with [its] desire that no one should be suspicious" of his capacity to render a fair verdict. It acted well within its discretion under N.C.G.S. § 15A-1215(a) in doing so.

[2]  Defendant next contends the trial court erred in talking to juror Brown about the case out of defendant's presence. The trial court's reference to "something you told me earlier" in its remarks to juror Brown indicates that an *ex parte* conversation between the court and juror Brown did occur. He argues that the conversation deprived him of his right to be present at every critical stage of his trial, citing Article I, sections 18, 23 and 24 of the North Carolina Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. In a capital case, the defendant's "right to be present at every stage of his trial is unwaivable." *State v. Pittman*, 332 N.C. 244, 253, 420 S.E.2d 437, 442 (1992). In a non-capital case, such as this one, the right is "a personal

right which [can] be waived, either expressly, or by [the defendant's] failure to assert it." *Id.*

While we have disapproved the practice of a trial court conducting private conversations with jurors, *State v. Tate*, 294 N.C. 189, 198, 239 S.E.2d 821, 827 (1978), the conversation in question could not have prejudiced defendant. The record establishes that the substance of the conversation related to juror Brown's having "overheard something about the case." The court excused juror Brown to insure that "no one should be suspicious" about his ability to be fair and impartial. Because this juror was removed from the case prior to deliberations, and no juror indicated that he or she had overheard anything about the case, the conversation between the court and juror Brown could not have influenced the verdict.

[3] Defendant next contends that the trial court erred in giving the following instruction to the jury prior to the presentation of evidence:

> Do not make up your mind as to what your verdict will be in the case.

> Now, you will be hearing all of the State's evidence, or at least all of the direct evidence, before you hear any evidence of the defendant, if the defendant chooses to offer evidence, and it is unusual for us to hear so much evidence on one side and the inclination is to come to some tentative conclusions, but I charge it is your duty to keep an open mind until you have heard all of the evidence, that is, from both sides, and then you should keep an open mind until you have discussed the case in the jury room.

> So please do not make up your mind as to how you will vote in the case, and try as best you can to refrain from drawing any conclusions about guilt or innocence in the case.

He argues that by using the word "unusual" the court intimated that the amount of evidence to be presented by the State was out of the ordinary, and that by saying there was "so much evidence on one side" the court commented on the weight of the evidence. He asserts that the comments constituted an expression of opinion by the trial court in violation of N.C.G.S. §§ 15A-1222 and 15A-1232.

N.C.G.S. § 15A-1236(a)(3) provides:

The judge at appropriate times must admonish the jurors that it is their duty:

. . . .

(3) Not to form an opinion about the guilt or innocence of the defendant, or express any opinion about the case until they begin their deliberations[.]

The court here was simply admonishing the jurors, pursuant to this provision, to maintain an open mind until they conducted their deliberations. To this end, it instructed them to resist their natural impulses to reach preliminary conclusions based on the quantity of evidence presented by the opening side. It informed the jurors that it was their duty to hear evidence from both sides and to discuss the case among themselves before reaching a conclusion. The instruction, in context, contains no expression of opinion about any question to be decided by the jury or about the weight of the evidence. The instruction was proper and indeed was favorable to defendant, as it attempted to neutralize the jury until defendant could present his side of the case.

[4] Defendant finally contends that the trial court erred in giving the following instruction to the jury immediately prior to its deliberations:

Now, your verdict must be unanimous. You may not take a vote by a majority, but all 12 of the retiring jurors must agree as to what your verdict will be in each of these cases. That being the requirement of the law it is important that you not go to the jury room and immediately take a vote or immediately stake yourself out on a strong position. Your duty is to discuss the evidence at some length until you feel there is some general consensus about the facts in the case. And then you should discuss the law relating to the charge you may have under consideration until you feel there is some general consensus about the law. And when you feel you are near a unanimous decision, you may take a vote, but even then, if your vote is not unanimous it is your duty to continue to reason together in an effort to reach a unanimous verdict, if that can be done without violating anyone's conscientious convictions. No one is required to compromise his or her convictions about the case for the purpose of reaching a unanimous verdict. As a matter of fact, that would be a violation of your oath.

STATE v. HARRINGTON

[335 N.C. 105 (1993)]

But since it is required that the vote be unanimous, I suggest to you that if you immediately take a vote or immediately state a strong position, the[n] it becomes more difficult for you to keep an open mind and to listen to some general discussion or persuasive discussion about the case.

He argues that the instruction violates both N.C.G.S. § 15A-1235 and the jurors' free speech rights under the First Amendment to the United States Constitution.

N.C.G.S. § 15A-1235 provides, in pertinent part:

(a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:

(1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

The instruction in question falls squarely within the provisions of this statute. It did not, as defendant in effect contends, invade the province of the jury by prescribing the procedure for its deliberations. It simply instructed the jurors, in accordance with the statute, that they must be unanimous in order to return a verdict, that they have a duty to consult and deliberate, that they should try to reach agreement but only if this can be accomplished without violating any member's convictions, and that they should keep an open mind in the process. The instruction fully accorded with the

law; it neither invaded the province of the jury nor violated the jurors' First Amendment rights. Each juror had complete freedom under the instruction, within the confines of the jury room, to express fully and openly his or her views on the case. There is no merit to this argument.

We conclude that defendant received a fair trial, free of prejudicial error.

NO ERROR.