An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1182
NORTH CAROLINA COURT OF APPEALS

Filed: 19 August 2014

STATE OF NORTH CAROLINA

v.

Mecklenburg County
Nos. 11 CRS 218387-88, 218434

ROBERT MCPHAIL


Appeal by defendant from judgments entered 17 April 2013 by Judge Robert T. Sumner in Mecklenburg County Superior Court. Heard in the Court of Appeals 4 March 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General I. Faison Hicks, for the State.*
>
> *Kathryn L. VandenBerg, for Defendant.*


ERVIN, Judge.


Defendant Robert McPhail appeals from judgments entered based upon his convictions for first degree murder and conspiracy to commit robbery with a dangerous weapon. On appeal, Defendant contends that the trial court erred by failing to conduct an investigation into whether jurors had been subjected to improper external influences, temporarily closing the courtroom during the questioning of the juror without making

adequate findings of fact, and awarding $113,140.52 in restitution in the absence of sufficient evidentiary support. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgment in the case in which Defendant was convicted of conspiracy to commit robbery with a dangerous weapon should remain undisturbed, that Defendant's conviction for first degree murder should remain undisturbed, but that the trial court's judgment in the first degree murder case should be vacated, and that case should be remanded to the Mecklenburg County Superior Court for the sole purpose of the entry of a new judgment in which the amount of restitution is calculated correctly.

## I. Factual Background

### A. Substantive Facts

On 15 April 2011, Defendant and N'Gai Yarree Sutton[1] discussed a robbery that they intended to commit along with Damon Grimes. According to the plan that the men developed, Mr. Grimes would bring an individual to the Roseland Apartments for the purpose of purchasing marijuana. After this individual arrived, the group intended to rob him. Defendant told Mr.

---

[1] Mr. Sutton pled guilty to second degree murder and robbery with a dangerous weapon pursuant to a plea agreement in which he agreed to provide truthful testimony at Defendant's trial.

Sutton that the "big guy"[2] would have the money.  Defendant, who owned an AK-47, was supposed to bring his firearm to the site of the robbery.

On the following day, Defendant and Mr. Sutton were told that the robbery would occur at Mr. Grimes' apartment at Woodstone Apartments instead of at the Roseland Apartments.  As a result, Yvette Funderburke, Defendant's girlfriend, drove Mr. Sutton and Defendant to the Woodstone Apartments.  According to Mr. Sutton, Defendant put his AK-47 in the trunk of Ms. Funderburke's vehicle before leaving for Mr. Grimes' apartment.  At the time that the group arrived at the Woodstone Apartments, Defendant retrieved his AK-47 and joined Mr. Sutton in entering Mr. Grimes' apartment.

At approximately 12:15 p.m. on 16 April 2011, Mr. Wallace and Usef Guy Isabell drove to Mr. Isabell's sister's apartment at the Woodstone Apartments, at which Mr. Wallace intended to purchase seven pounds of marijuana from Mr. Grimes.  Mr. Wallace had purchased marijuana from Mr. Grimes at that location on multiple occasions.  Upon arriving at the apartment, Mr. Isabell and Mr. Wallace were instructed to wait in the kitchen.

After entering the apartment, Mr. Sutton went to the kitchen, where he found two men sitting at a table.  At that

---

[2]At the time of his death, Larry Dean Wallace was 6 feet, 5 inches tall and weighed 469 pounds.

point, Mr. Sutton said, "you know what time it is;" walked up to the "big guy," who was Mr. Wallace; and went through Mr. Wallace's pockets, from which he took money and marijuana. As Mr. Sutton took Mr. Wallace's money and marijuana, Defendant pointed his rifle at him. At the time that Mr. Sutton turned to leave, Defendant fired a shot at Mr. Wallace, who fell. After Mr. Sutton and Defendant returned to the car, Ms. Funderburke drove the group to her residence, where Defendant, Mr. Sutton and Mr. Grimes divided the money and marijuana that had been obtained in the robbery. Mr. Wallace died as the result of a gunshot wound to the chest.

## B. Procedural History

On 19 April 2011, warrants for arrest charging Defendant with murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon were issued. On 2 May 2011, the Mecklenburg County grand jury returned bills of indictment charging Defendant with murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. On 4 August 2011, the State announced that it did not intend to proceed against Defendant capitally. The charges against Defendant came on for trial before the trial court and a jury at the 8 April 2013 criminal session of the Mecklenburg County Superior Court. On 17 April 2013, the jury

returned a verdict convicting Defendant of first degree murder on the basis of the felony murder rule with robbery with a dangerous weapon as the predicate felony, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. At the conclusion of the ensuing sentencing hearing, the trial court arrested judgment in the case in which Defendant had been convicted of robbery with a dangerous weapon and entered judgments sentencing Defendant to a term of life imprisonment without the possibility of parole based upon Defendant's conviction for first degree murder and to a consecutive term of 38 to 55 months imprisonment based upon Defendant's conviction for conspiracy to commit robbery with a dangerous weapon. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Substantive Legal Analysis

### A. Failure to Conduct Jury Inquiry

In his initial challenge to the trial court's judgments, Defendant argues that the trial court erred by failing to investigate the extent to which members of the jury had been subjected to improper external influences. More specifically, Defendant contends that the trial court erroneously failed to conduct an inquiry into the extent to which the other members of the jury had been subject to improper external influences after

one juror had expressed concern about having been stared at by members of the gallery and approached in the parking lot by a trial spectator and indicated that other members of the jury had discussed and expressed concern about the conduct of the members of the gallery. We do not believe that Defendant is entitled to relief from the trial court's judgments based upon this argument.

### 1. Standard of Review

"Due process requires that a defendant have 'a panel of impartial, "indifferent" jurors.'" *State v. Williams*, 330 N.C. 579, 583, 411 S.E.2d 814, 817 (1992) (citing *State v. Rutherford*, 70 N.C. App. 674, 677, 320 S.E.2d 916, 919, *disc. review denied*, 313 N.C. 335, 327 S.E.2d 897 (1985) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751, 755 (1961)). "The trial court has the duty to insure that jurors for the case being tried remain impartial and uninfluenced by outside persons." *Williams*, 330 N.C. at 583, 411 S.E.2d at 817 (citing *Rutherford,* 70 N.C. App. at 677, 320 S.E.2d at 919). However, "[a]n examination is 'generally' required only 'where some prejudicial content is reported.'" *State v. Harrington*, 335 N.C. 105, 115, 436 S.E.2d 235, 240-41 (1993) (quoting *State v. Drake*, 31 N.C. App. 187, 192, 229 S.E.2d 51, 54 (1976)). "Whether alleged misconduct has affected

the impartiality of a particular juror is a discretionary determination for the trial court[,]" *State v. Clark*, 138 N.C. App. 392, 398, 531 S.E.2d 482, 487 (2000), *cert. denied*, 353 N.C. 730, 551 S.E.2d 108 (2001), with this determination to be made based upon an analysis of the facts and circumstances present in the case under consideration. *Rutherford*, 70 N.C. App. at 677, 320 S.E.2d at 919. "'The determination of the existence and effect of juror misconduct is primarily for the trial court whose decision will be given great weight on appeal.'" *Williams*, 330 N.C. at 583, 411 S.E.2d at 817 (quoting *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991)).

## 2. Relevant Facts

At the beginning of the sixth day of Defendant's trial, shortly before the jury instruction conference, the trial court received a letter from a member of the jury in which she stated that she was being stared at by certain gallery members, that this conduct made her fear for her safety, and that she would be unable to reach a fair and impartial verdict in light of her concerns. After receiving the juror's letter and consulting with counsel for both parties, the trial court cleared the courtroom of everyone with the exception of court personnel, Defendant, his trial counsel, the prosecutors, and a

representative from the Charlotte-Mecklenburg Police Department and brought the juror into the courtroom.

In response to the trial court's inquiry, the juror in question stated that the letter that she had transmitted to the trial court stemmed from two separate incidents. In the first of these incidents, members of the gallery sitting on Defendant's side of the courtroom had been staring at her in what she believed to be an effort to intimidate her. In her letter, the juror specified that the conduct of two women, in particular, had made her uncomfortable and fearful, so that she was "scared to death" when she left the courtroom.

The second incident occurred as the juror walked to her car after leaving the courtroom at the end of the day's proceedings. As the juror passed a car parked on the same level of the parking deck as the one in which her car was parked, a man sitting in that vehicle said, "hey, how are you doing?" The juror believed that the man who had spoken to her had been sitting in the back of the courtroom on Defendant's side during part of the trial. Although the juror was already scared by the conduct of the women who had stared at her in the courtroom, this incident frightened her even more.

After describing these two incidents, the juror informed the trial court that she felt unsafe and feared that someone

might attempt to harm her if she failed to return a verdict in Defendant's favor. For that reason, the juror stated that, even if the State proved Defendant's guilt beyond a reasonable doubt, she would still refrain from returning a guilty verdict.[3] In response to the trial court's inquiry concerning whether she had shared any of her concerns with other members of the jury, the juror denied having done so. However, the juror did inform the trial court that other jurors had mentioned that members of the gallery had been staring at them and that one juror had expressed a desire to have an escort at the time that he or she left the courtroom at the end of the day.

At the conclusion of this discussion, the trial court sent the juror to a room other than the one in which the other members of the jury were waiting and gave each party an opportunity to be heard with respect to the issue of whether the juror should remain a member of the jury. Although the State argued that the juror should be excused, Defendant expressed concern about excusing a juror at such a late stage of the trial

---

[3]In her letter to the trial court, the juror attempted to explain why these incidents were so disturbing, stating that "[a]dding to my anxiety is the memory of the time I tried to get a restraining order from the court against my ex-boyfriend and was sent away with nothing since not enough damage had been done yet." She further stated that, "[a]lthough I returned soon after with enough damage to get the order, . . . I know that the court lets things go too far out of hand before acting on them" and "I can't allow this to become another incident like that in my life."

and noted that a decision to replace the juror with an alternative would exhaust the supply of available alternate jurors. After reviewing the letter and hearing from the juror and counsel for both parties, the trial court determined that the juror should be excused and replaced by an alternate juror given the juror's expression of doubt about her ability to return a fair and impartial verdict in accordance with the law and the facts.

Having made this decision, the trial court stated that "[t]he second issue is my concern about what [the juror] described and what [the juror] heard from the other jurors." Although the trial court expressed doubt to the parties "that it's in anyone's best interest to approach that subject with other jurors," it stated that "I'll certainly let you speak to that if you think that it's necessary." Neither party dissented from the trial court's logic with respect to the issue of whether the other jurors should be brought in for further questioning.

Subsequently, the trial court addressed the issue of what steps should be taken concerning the behavior of spectators during the remainder of the trial. On the one hand, the State argued that the courtroom should be closed for the remainder of the trial to ensure that no additional problematic incidents

occurred. On the other hand, Defendant objected to any decision to close the courtroom. At the conclusion of this discussion, the trial court decided to refrain from closing the courtroom during the remaining trial proceedings. However, the trial court also decided to address the gallery outside the presence of the jury concerning the manner in which they should behave in the courtroom. Both the State and Defendant expressed agreement with the manner in which the trial court proposed to proceed.

### 3. Legal Analysis

Although Defendant contends that the trial court abused its discretion by failing to make inquiry of the other members of the jury concerning the extent, if any, to which they had knowledge of incidents or had concerns similar to those expressed by the excused juror, the fact that the excused juror denied having mentioned her concerns to any other member of the jury, the fact that none of the other jurors had expressed similar concerns, and the fact that the record contains no indication that any other member of the jury lacked the ability to return a fair and impartial verdict raises serious doubts about the validity of Defendant's argument that the trial court's decision to refrain from making an inquiry of the other members of the jury concerning the extent to which they had been subject to improper external influences constituted an abuse of

discretion. However, we need not reach this issue given the fact that Defendant neither objected to the trial court's decision to refrain from conducting such an inquiry nor requested that such an inquiry be conducted. *State v. Najewicz*, 112 N.C. App. 280, 291, 436 S.E.2d 132, 139 (1993) (holding that, given the defendant's failure to make any "motion for mistrial or request for other court action based upon the alleged juror misconduct," he had waived his right to challenge the trial court's failure to act on appeal).

In apparent recognition of his failure to properly preserve this issue for appellate review, Defendant contends that we should reach the merits of his "external influence" claim in reliance upon N.C. R. App. P. 2 in the event that we conclude that this issue is not properly before us. As the Supreme Court has indicated, however, an appellate court should only utilize its authority to overlook appellate rule violations under N.C. R. App. P. 2 "when necessary to prevent manifest injustice to a party or to expedite decision in the public interest," with the presence of "exceptional circumstances" in the case under consideration being the critical factor in determining whether we should act in the manner that Defendant recommends. *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008) (citing *State v. Hart*, 361 N.C.

309, 315-17, 644 S.E.2d 201, 205-06 (2007), and *Steingress v. Steingress*, 350 N.C. 64, 66, 511 S.E.2d 298, 299-300 (1999) (internal quotations omitted)).  We see nothing in the present record establishing that there are any "exceptional circumstances" present in this case that suffice to support the invocation of our authority to overlook Defendant's failure to properly preserve this issue for appellate review pursuant to N.C. R. App. P. 2.  As a result, Defendant is not entitled to relief from his convictions based upon this aspect of his challenge to the trial court's judgments.

## B. Right to Public Trial

Secondly, Defendant argues that the trial court erred by temporarily closing the courtroom to the public during the questioning of the excused juror.  More specifically, Defendant contends that the trial court erred by closing the courtroom to members of the public during the inquiry concerning the issues raised by the excused juror without making findings of fact sufficient to support this decision.  Once again, we conclude that Defendant is not entitled to relief from the trial court's judgments on the basis of this argument.

## 1. Standard of Review

A criminal defendant is entitled to a "public trial."  U.S. Const. amend. VI; *State v. Rollins*, __ N.C. App. __, __ 729

S.E.2d 73, 76-77 (2012).  As a result, a claim that a defendant was denied the right to an open and public trial is an assertion of constitutional magnitude.  We review alleged constitutional violations *de novo*.  *State v. Comeaux*, __ N.C. App. __, __, 741 S.E.2d 346, 349 (2012), *disc. review denied,* 366 N.C. 584, 739 S.E.2d 853 (2013).

## 2. Courtroom Closure

"'In clearing the courtroom, the trial court must determine if the party seeking closure has advanced an overriding interest that is likely to be prejudiced, order closure no broader than necessary to protect that interest, consider reasonable alternatives to closing the procedure, and make findings adequate to support the closure.'"  *State v. Starner*, 152 N.C. App. 150, 154, 566 S.E.2d 814, 816–17 (quoting *State v. Jenkins*, 115 N.C. App. 520, 525, 445 S.E.2d 622, 625, *disc. review denied*, 337 N.C. 804, 449 S.E.2d 752 (1994) (citing *Waller v. Georgia*, 467 U.S. 39, 48, 104 S. Ct. 2210, 2216, 81 L. Ed. 2d 31, 39 (1984)), *cert. denied*, 356 N.C. 311, 571 S.E.2d 209 (2002).  However, the trial court is not required to make specific findings of fact in the event that the defendant consents to the closing of the courtroom.  *Id.* at 154, 566 S.E.2d at 817.

At the time that the courtroom was closed to members of the public for the purpose of inquiring about the issues raised by the excused juror's letter, the trial court stated that, "[a]fter consulting with the attorneys for the State and the attorney for the defendant, I've decided to clear the courtroom except as to the court personnel, of course the defendant, his attorney, the State's attorneys and their representative from the [Charlotte-Mecklenburg Police Department]." After making this announcement, the trial inquired if either party had "[a]nything before I bring her in?" In response, Defendant's trial counsel responded "[n]o, Your Honor." Although the consultation between the trial court and counsel for the parties occurred off the record, it is clear from the materials presented for our review that Defendant had an opportunity to object to the closing of the courtroom on the record and specifically declined to do so. In a remarkably similar case, we held that the defendant waived the right to object to the trial court's decision to close the courtroom to members of the public without holding a hearing or making adequate findings of fact on the grounds that the defendant had been given an opportunity to object to the trial court's decision and declined to take advantage of that opportunity. *State v. Smith*, 180 N.C. App. 86, 98, 636 S.E.2d 267, 275 (2006). As a result, in light

of the complete absence of any indication that Defendant expressed any disagreement with the trial court's decision to close the courtroom despite being given ample opportunity to lodge an objection to the proposed procedure,[4] we hold that Defendant is not entitled to relief from his convictions based upon the trial court's decision to temporarily close the courtroom.

## C. Restitution Award

Finally, Defendant contends that the trial court erred by ordering him to pay $113,140.52 in restitution. More specifically, Defendant argues that the record developed before the trial court did not support the amount of the trial court's restitution award. Defendant's argument has merit.

### 1. Standard of Review

Although Defendant did not lodge a contemporaneous objection to the trial court's restitution award, "no objection is required to preserve for appellate review issues concerning the imposition of restitution." *State v. Smith*, 210 N.C. App.

---

[4]In his brief, Defendant points out that he did object to the State's suggestion to close the courtroom during closing arguments and other proceedings subsequent to the inquiry into the issues raised by the excused juror's letter. Aside from the fact that the trial court declined to close the courtroom during the remaining portions of the trial, the fact that Defendant objected to closing the courtroom at one point in the trial does not constitute a valid objection to the trial court's decision to close the courtroom at a different stage of the proceedings.

439, 443, 707 S.E.2d 779, 782 (2011) (citing *State v. Mumford,* 364 N.C. 394, 402–03, 699 S.E.2d 911, 917 (2010)). "The amount of restitution must be limited to that supported by the record[.]" N.C. Gen. Stat. § 15A–1340.36(a). "Issues at a sentencing hearing may be established by stipulation of counsel if that stipulation is '"definite and certain."'" *Mumford*, 364 N.C. at 403, 699 S.E.2d at 917 (citing *State v. Alexander*, 359 N.C. 824, 828, 616 S.E.2d 914, 917 (2005) (quoting *State v. Powell*, 254 N.C. 231, 234, 118 S.E.2d 617, 619 (1961) (citations omitted))). "In the absence of an agreement or stipulation between defendant and the State, evidence must be presented in support of an award of restitution." *State v. Buchanan*, 108 N.C. App. 338, 341, 423 S.E.2d 819, 821 (1992). "Unsworn statements made by the prosecutor are insufficient to support the amount of restitution ordered." *State v. Wright*, 212 N.C. App. 640, 645, 711 S.E.2d 797, 801, *disc. review denied*, 365 N.C. 351, 717 S.E.2d 743 (2011). "On appeal, we review *de novo* whether the restitution order was 'supported by evidence adduced at trial or at sentencing.'" *Wright*, 212 N.C. App. at 645, 711 S.E.2d at 801 (quoting *State v. Shelton*, 167 N.C. App. 225, 233, 605 S.E.2d 228, 233 (2004)).

## 2. Relevant Facts

After counsel for the parties addressed the trial court concerning sentencing-related issues, the State sought the entry of an order requiring the payment of restitution in the amount of $113,140.52. In support of this request, the State presented medical and funeral bills that totaled this amount to the trial court. In response, Defendant stated that the only medical bill of which he was aware totaled approximately $84,000.00. At the conclusion of the sentencing hearing, the trial court ordered Defendant to pay, jointly and severally with his codefendants, restitution in the amount of $113,140.52, with this amount to be docketed as a "civil lien."

### 3. Legal Analysis

Although the State tendered medical and funeral bills totaling $113,140.52 to the trial court at the sentencing hearing, the bills were never offered or admitted into evidence. For that reason, we have little choice but to conclude that the amount of restitution awarded in this case rested upon nothing beyond the unsworn statement of the prosecutor, a form of proof that is "insufficient to support the amount of restitution ordered." *Wright*, 212 N.C. App. at 645, 711 S.E.2d at 801. Thus, the trial court's restitution award lacks sufficient evidentiary support.

In seeking to persuade us to reach a different result, the State argues that, by failing to contest or dispute the documentary materials submitted to the trial court at the sentencing hearing, Defendant effectively stipulated to the appropriateness of the restitution amount awarded by the trial court.[5]  However, we do not read the record as supportive of the State's contention.  Instead, when the trial court asked Defendant's counsel if he had seen the bills upon which the State relied, Defendant's trial counsel responded, "I guess the only thing we have is that $84,000 bill from [Carolinas Medical Center] whether that's still the same amount . . . [b]ut that's all that we'd bring up."  When read in context, the statement made by Defendant's trial counsel simply did not amount to a "definite and certain" stipulation.  *Mumford*, 364 N.C. at 403, 699 S.E.2d at 917.  Although Defendant's trial counsel did not object to the restitution amount sought by the State in so many words, his statement cannot be understood as indicating anything other than an assertion that he had seen a single bill in an amount substantially less than the award sought by the State and knew nothing about the other bills upon which the State relied

_____

[5]The State has not contended that the documents upon which the trial court relied were admitted into evidence or should otherwise be deemed properly before the trial court on the basis of any theory aside from the "stipulation" approach discussed in the text.

in support of its restitution request. For that reason, we cannot construe the statement made by Defendant's trial counsel as a "definite and certain" stipulation of the amount of restitution that the trial court was entitled to award. *See Smith*, 210 N.C. App. at 444-45, 707 S.E.2d at 783 ("We do not consider Defendant's silence or lack of objection to the restitution amount to constitute a 'definite and certain' stipulation as required by North Carolina law"). As a result, given that Defendant did not stipulate to the restitution amount deemed appropriate by the trial court and given that the evidentiary record did not support the trial court's restitution award, the trial court's judgment in the case in which Defendant was convicted of first degree murder is vacated and that case is remanded to the trial court for the purpose of entering a new judgment containing a properly calculated restitution award. *State v. Moore*, 365 N.C. 283, 286, 715 S.E.2d 847, 849–50 (2011) (stating that "the appropriate course here is to remand for the trial court to . . . calculate the correct amount of restitution").

## III. Conclusion

Thus, for the reasons set forth above, we conclude that Defendant's challenges to his convictions lack merit. On the other hand, we conclude that the trial court erred by awarding

an amount of restitution that lacked adequate evidentiary support. As a result, although we find no error in Defendant's convictions and in the trial court's judgment in the case in which Defendant was convicted of conspiracy to commit robbery with a dangerous weapon, the trial court's judgment in the case in which Defendant was convicted of first degree murder should be, and hereby is, vacated and that case should be, and hereby is, remanded to the Mecklenburg County Superior Court for the entry of a new judgment containing a properly calculated restitution award.

NO ERROR IN PART; VACATED AND REMANDED IN PART.

Judges McGEE and STEELMAN concur.

Report per Rule 30(e).