STATE OF NORTH CAROLINA v. ERIC FERNANDO MURILLO

No. 209A96

(Filed 31 December 1998)

## 1. Criminal Law § 98 (NCI4th Rev.)— discovery—form of response

The trial court did not err in a first-degree murder prosecution by denying defendant's motions for discovery and by failing to sanction the State for its failure to provide discovery. Defendant did not indicate that the prosecution suppressed any evidence, but merely asserted disjointed presentation of the

STATE v. MURILLO

[349 N.C. 573 (1998)]

statements. The statements provided complied with the letter and the spirit of the mandate of N.C.G.S. § 15A-903(a)(2), defendant was protected from unfair surprise, and any other evidence of which defendant might have been deprived was not material.

2. **Evidence and Witnesses §§ 876, 881 (NCI4th)— first-degree murder—statements of victim—abused spouse— state of mind hearsay exception**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by admitting testimony that the victim had said she was going home to Massachusetts for the summer, leaving the inference that the victim and defendant were separating. Competent evidence had been introduced that defendant had threatened to kill the victim if she left him and her statement was relevant to show motive and to show her state of mind.

3. **Evidence and Witnesses § 929 (NCI4th)— first-degree murder—abused spouse—statement of victim—excited utterance**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by admitting testimony about a phone conversation in which the victim related that defendant had held a gun to her head. The testimony indicated that the victim had called her brother-in-law immediately after the incident while she was still upset and had not had time to reflect; the testimony was properly admitted as an excited utterance. N.C.G.S. § 8C-1, Rule 803(2).

4. **Evidence and Witnesses §§ 929, 3126 (NCI4th)— first-degree murder—statement of victim—excited utterance— not corroboration**

There was no prejudicial error in a capital prosecution for the first-degree murder of an abused spouse where the court allowed the victim's father to testify that the victim had told him that defendant had beaten her while they were on a beach trip and that defendant had shot a gun next to her head. The testimony was not admissible to corroborate the witness's testimony about the two incidents; prior consistent statements are admissible for corroboration, but this rationale does not justify admission of extrajudicial declarations of someone other than the witness. However, this witness gave testimony as to these incidents within the excited utterance exception, so that the hearsay testimony of

what the victim belatedly told the witness about the same events did not effect the verdict and was not prejudicial.

**5. Evidence and Witnesses § 876 (NCI4th)— first-degree murder—abused spouse—statements by victim in workplace**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by permitting the assistant principal at the victim's workplace to testify about beatings the victim described after the alleged abuse occurred. The transcript reveals that the victim recounted the past beatings only when confronted with her injuries and that she broke down and explained what was happening in her life to make her afraid, upset, and bruised. The victim's explanatory comments about the beatings were made contemporaneously with and in explanation of her statements and crying, thus showing her state of mind.

**6. Evidence and Witnesses §§ 876, 929 (NCI4th)— first-degree murder—abused spouse—statements to sisters and friends**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by allowing the victim's sisters and friends to testify as to various beatings that the victim described. The victim either called the witnesses immediately after the beating or described the beatings as the bases for her fear, placing the statements within the excited-utterance exception or the state of mind or emotion exception.

**7. Evidence and Witnesses § 876 (NCI4th)— first-degree murder—abused spouse—tape recorder—state of mind of victim**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by allowing a friend of the victim to testify that she gave the victim a voice-activated tape recorder to use to catch defendant committing adultery. The trial court found that there was competent evidence that defendant had threatened to kill the victim if she left him and the existence of the tape was relevant to show the victim's intent to leave the defendant.

STATE v. MURILLO

[349 N.C. 573 (1998)]

**8. Evidence and Witnesses §§ 876, 929 (NCI4th)— first-degree murder—abused spouse—victim's statement as to bruise**

There was no prejudicial error in a capital prosecution for the first-degree murder of an abused spouse where the court permitted a witness to testify that the victim had told her that she received a large bruise on her head when defendant threw her into a wall. The victim was not upset and was not relating feelings or intent regarding her relationship with defendant, so that the testimony was an improper recitation of mere remembered facts. However, the voluminous admissible testimony regarding violence directed toward the victim renders this error harmless. Other testimony by this witness was tangential to the question of defendant's guilt or reflected the victim's state of mind about her marriage and related to an event that could cause a confrontation with defendant.

**9. Evidence and Witnesses § 735 (NCI4th)— first-degree murder—abused spouse—admission not plain error**

There was no plain error in a capital prosecution for the first-degree murder of an abused spouse where the court admitted hearsay testimony that defendant came to the school where the victim worked to collect her paychecks and that the defendant determined whether the victim could drive a car. The admission of this testimony was not such a prejudicial error as to prevent justice from being done.

**10. Evidence and Witnesses § 876 (NCI4th)— first-degree murder—abused spouse—creation of nest egg—state of mind hearsay exception**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by admitting testimony that the victim had given part of her paycheck to a friend to create a "nest egg" and that she planned on leaving defendant. This clearly reflects the victim's state of mind about her marriage and related directly to circumstances giving rise to a potential confrontation with defendant.

**11. Evidence and Witnesses § 761 (NCI4th)— first-degree murder—abused spouse—testimony of previous incidents—admission not prejudicial**

There was no prejudicial error in a capital prosecution for the first-degree murder of an abused spouse where the trial court

admitted testimony from the victim's sister about a beating the victim had suffered at Thanksgiving in 1988 and about the circumstances leading to the victim's final trip to Massachusetts to retrieve her sons. The Thanksgiving beating had previously been explored with competent testimony and the testimony that defendant and the victim argued before the Massachusetts trip was harmless in light of overwhelming competent evidence that defendant and the victim argued often.

**12. Evidence and Witnesses § 3127 (NCI4th)— first-degree murder—abused spouse—testimony of victim's mother—corroboration**

There was no prejudicial error in a capital prosecution for the first-degree murder of an abused spouse in the admission of testimony from the victim's mother. Her testimony about an incident in which defendant held a gun to the victim's head was admissible to corroborate a deputy's earlier testimony, the mother's testimony to an argument between defendant and the victim was not prejudicial in light of overwhelming competent evidence that defendant and the victim argued often, and the remainder of her testimony recounted excited utterances or the victim's state of mind.

**13. Evidence and Witnesses § 90 (NCI4th)— first-degree murder—abused spouse—previous attacks on spouse—not overly prejudicial**

There was no abuse of discretion in a capital prosecution for the first-degree murder of an abused spouse in the admission of evidence of prior incidents toward the spouse. Contrary to defendant's assertion, the evidence was not overly prejudicial as subjecting defendant to trial for beating his wife. Testimony about a defendant-husband's arguments with, violence toward, and threats to his wife were properly admitted in his subsequent trial for her murder.

**14. Evidence and Witnesses § 876 (NCI4th)— first-degree murder—abused spouse—state of mind hearsay exception—remoteness**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by admitting certain statements of the victim as within the state of mind exception. Although defendant contended that the statements should have been excluded because of remoteness, evidence spanning the

entire marriage has been allowed when a husband is charged with murdering his wife.

**15. Evidence and Witnesses § 335 (NCI4th)— first-degree murder—abused spouse—killing of prior spouse— admissible**

The trial court did not err in a capital prosecution for the first-degree murder of an abused spouse by admitting evidence of defendant's first wife's death at his hands in 1970. The evidence was properly admitted to show lack of accident and to support a finding that defendant intended to kill this victim. The court told the jury that it could consider evidence of the prior shooting when deciding issues of intent, plan, premeditation, and absence of accident, but expressly warned jurors not to consider the death as proof of defendant's propensity to commit the crime.

**16. Evidence and Witnesses § 292 (NCI4th)— first-degree murder—abused spouse—killing of prior spouse—involuntary manslaughter conviction**

The trial court did not abuse its discretion in a first-degree murder prosecution by admitting evidence of the death of defendant's first wife where defendant was convicted of involuntary manslaughter in that death. Although defendant argues that admitting evidence of his first wife's death subjects him to double jeopardy, there was substantial evidence from which a jury could determine that defendant committed the similar act; the evidence of the prior death was not admitted to show only intent, plan, or motive; the probative value of that death does not depend on any additional fact or element not present in defendant's conviction and defendant's own statements call into question his assertion of accident in both deaths. Furthermore, the first death was not so remote in time as to have lost its probative value or be more prejudicial then probative.

**17. Constitutional Law § 344.1 (NCI4th)— first-degree murder—right to be present—recorded bench conferences**

The federal constitutional rights of a capital first-degree murder defendant were not violated by three recorded bench conferences. Furthermore, defendant's rights under Article I, Section 23 of the North Carolina Constitution were not violated because defendant at all times either had actual knowledge of the substance of the discussion or constructive knowledge through his

attorneys. He makes no showing that his presence at the bench would have been useful.

**18. Criminal Law § 532 (NCI4th Rev.)— first-degree murder—juror entering courtroom during hearings—juror not dismissed**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by not excusing a juror *ex mero motu* where the juror twice entered the courtroom inadvertently and fleetingly during hearings. No motion was made for a new trial based on juror misconduct or for a further inquiry into what the juror might have heard and any discussion the juror might have overheard was either eventually allowed before the juror or tangential to the issues. The trial court witnessed all of the events in question and both the existence of misconduct and the effect of misconduct are determinations within the trial court's discretion.

**19. Evidence and Witnesses § 264 (NCI4th)— first-degree murder—victim's performance as school teacher—rebuttal of defendant's contention**

The trial court did not abuse its discretion in a capital prosecution for the first-degree murder of an abused spouse by admitting character evidence concerning the victim's performance as a school teacher. The trial court determined that the victim's teaching performance was relevant to rebut contentions in defendant's opening statement that the victim was a violent alcoholic whose abusive behavior was not limited to defendant.

**20. Evidence and Witnesses § 1776 (NCI4th)— first-degree murder—demonstration—witness the same size as defendant**

The trial court did not abuse its discretion in a capital prosecution for the first-degree murder of an abused spouse by allowing the victim's sister to demonstrate, after testifying that she and the victim wore the same clothes and were the same size, that her forearm and head could not be positioned such that the bullet holes matched as they did in the victim's body if an accident had occurred in the way defendant claimed. The trial court conducted a *voir dire* and evaluated the probative and prejudicial value of the demonstration.

**21. Evidence and Witnesses § 3161 (NCI4th)— first-degree murder—cross-examination of victim's minor son—use of prior inconsistent statement**

There was no abuse of discretion in a capital prosecution for the first-degree murder of an abused spouse where defendant contended that the trial court erroneously sustained the State's objection to defense counsel's cross-examination of the victim's minor son regarding a prior inconsistent statement. Although the son testified that defendant looked angry immediately before the shooting, no such description was present in the statement made to police officers immediately after the shooting; the objection was sustained based on the detective barely talking to the boys because they were traumatized. The son had already presented the evidence defendant sought to elicit and the objection could have been sustained for repetitiveness.

**22. Evidence and Witnesses § 1657 (NCI4th)— first-degree murder—abused spouse—nature of relationship—photographs—excluded**

There was no abuse of discretion in a capital prosecution for the first-degree murder of an abused spouse where defendant sought to introduce photographs and testimony rebutting various contentions of family animosity, the court determined that some of the photographs could be used to illustrate testimony of the persons pictured, but excluded testimony of the walls of the apartment because no one could testify to taking the pictures and they were not necessary or sufficiently dated to illustrate the testimony of witnesses who denied seeing bullet holes in the walls. The trial court exercised proper discretion to exclude unreliable photographs taken at an indeterminate date that could have been more confusing or misleading than probative, and defendant presented numerous witnesses who testified that he had a happy marriage.

**23. Criminal Law § 439 (NCI4th Rev.)— first-degree murder—prosecutor's closing arguments—prior murder**

There was no error in a capital prosecution for first-degree murder where the trial court did not intervene *ex mero motu* in the prosecutor's closing argument in the guilt phase where defendant asserted that the prosecutor asked the jury to convict defendant of first-degree murder because he "got away with it" in the death of a prior spouse. A review of the closing arguments

reveals that the prosecutors did no more than indicate similarities between the two wives' deaths and argue the improbability that an expert shooter would accidentally shoot and kill two of his four wives; these are reasonable inferences from the evidence and proper arguments.

**24. Criminal Law § 447 (NCI4th Rev.)— first-degree murder— prosecutor's argument—paid expert witness**

The prosecutor's arguments in the guilt phase of a capital first-degree murder prosecution concerning payment of defendant's forensic expert were not so grossly improper as to require the trial court to intervene *ex mero motu*. Prior cases involving arguments from sentencing proceedings are instructive but not controlling and, when defense counsel apparently did not believe the argument was prejudicial at trial, the Court could not conclude that the trial court should have intervened. Even assuming that the argument was improper, it was not prejudicial in light of the substantial evidence of defendant's guilt.

**25. Criminal Law § 457 (NCI4th Rev.)— capital sentencing— prior out-of-state conviction—prosecutor's argument**

The trial court did not err in a capital sentencing proceeding by allowing the prosecutor's statement that dismissals such as defendant's in the 1970 California killing of his first wife were commonplace. Viewed as a whole, the prosecutor was explaining why defendant's California conviction still counted as a conviction for purposes of finding the prior violent felony aggravating circumstance and, even if the statement was error, defendant suffered no prejudice because he argued that not all convictions are set aside and that certain conditions must be met for that to occur.

**26. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—nonstatutory mitigating factors**

The trial court did not err by not intervening *ex mero motu* in a capital sentencing proceeding where defendant contended that the prosecutor impermissibly asked the jury to find that some of the nonstatutory mitigators were aggravators, but the prosecutor in fact argued that the nonstatutory mitigating circumstances should not weigh heavily in the jurors' minds. There was no additional submission of aggravators and the prosecution emphasized in arguments that only one aggravator was being submitted to the jury.

**27. Criminal Law § 461 (NCI4th Rev.)— capital sentencing— prosecutor's argument—death penalty as deterrent**

The trial court did not err by not intervening *ex mero motu* in a capital sentencing proceeding where defendant contended that the prosecutor impermissibly argued for imposition of the death penalty because it would deter crime generally. The prosecutor was reminding the jury of its role and obligation to follow the law, did not impermissibly cite to general deterrence, and stayed within the established bounds.

**28. Criminal Law § 460 (NCI4th Rev.)— capital sentencing proceeding—prosecutor's argument—sympathy**

The trial court did not err in a capital sentencing proceeding by not intervening *ex mero motu* where defendant contended that the prosecutor impermissibly told the jury that the law does not permit sympathy. Although the trial court may not preclude the jury from considering compassion, the prosecutor may discourage the jury from having mere sympathy not related to the evidence; moreover, the prosecutor here did not tell the jury that it could not consider sympathy, but suggested that the jury focus on the facts and not consider sympathy.

**29. Criminal Law § 1364 (NCI4th Rev.)— capital sentencing— aggravating circumstance—prior California conviction**

The trial court did not err in a capital sentencing proceeding by allowing the submission of the prior violent felony aggravating circumstance based on a twenty-two-year-old California conviction for voluntary manslaughter. Defendant did not argue any effect that the subsequent dismissal of the conviction under California law may have had on North Carolina's sentencing procedures and contended instead that the conviction was too remote in time. The requirements of N.C.G.S. § 15A-2000(e)(3) were met and defendant's arguments about frustrating California's legislative intent were not relevant.

**30. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not arbitrary**

In a capital sentencing proceeding for the first-degree murder of an abused spouse, the evidence in the record fully supports the finding by the jury of the aggravating circumstance of a prior felony involving the use of violence and there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

**31. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

A sentence of death for the first-degree murder of an abused spouse was not disproportionate in light of a prior violent felony resulting in another death and the long history of defendant's abuse of this victim.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Ellis, J., on 18 April 1996 in Superior Court, Richmond County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 30 September 1998.

*Michael F. Easley, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

WHICHARD, Justice.

On 15 December 1992 a Hoke County grand jury indicted defendant for the first-degree murder of his wife, Beth Murillo. Upon defendant's motion for a change of venue, the case was transferred for trial to Richmond County. Defendant was tried capitally, and the jury returned a verdict finding him guilty of first-degree murder on the basis of premeditation and deliberation. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. For the reasons set forth herein, we conclude that defendant received a fair trial, free from prejudicial error, and that the sentence of death is not disproportionate.

The evidence showed that defendant and the victim had been husband and wife since 1987. They had histories of alcohol abuse, and defendant had threatened, verbally abused, and severely beaten the victim on many occasions throughout the marriage. The victim's school colleagues, family members, and friends testified to her black eyes and extensive bruising. Law-enforcement officers testified that on numerous occasions when they were summoned to the family home or cabin, they found the victim beaten and bloodied but refusing to swear out a warrant on defendant. The victim's family had intervened and taken her home to Massachusetts several times, but the victim always returned to defendant in North Carolina.

At the time of her death, the victim was staying with her two sons from a previous marriage at the family's cabin a short distance away from the family home. She and defendant had argued that evening at the local tavern they owned. Around 1:00 a.m. on 24 June 1992, after consuming numerous beers, the victim left the bar with her two sons. Defendant told her to go to the family home, but the victim instead drove to the cabin where she had been staying. She told her sons that if defendant came near her, she would kill him.

Defendant claimed he went to the cabin to avoid his wife and to let their tempers cool. The victim's sons testified that defendant arrived at the cabin, woke them, entered the victim's bedroom, and closed the door. The boys could hear the two arguing. The victim said, "Oh God, oh God," and a gun fired. Defendant claimed it fired accidentally while they struggled. When the boys asked about the sound, defendant began saying, "Oh God, don't die Beth." Defendant bundled the victim into his arms and drove her to the hospital, attempting mouth-to-mouth resuscitation as he drove.

The victim never regained consciousness and was removed from life support on 25 June 1992. She had bruises over seventy-five percent of her body and died from a single gunshot wound through the right temple. The bullet had passed through her right forearm before entering her head. The trial court admitted evidence that defendant's first wife, Debbie Kraft Murillo, also had died from a gunshot wound defendant inflicted; that death was ruled accidental.

[1] In his first assignment of error, defendant contends that the trial court erred in denying defendant's motions for discovery and in failing to sanction the State for its failure to provide discovery as the trial court ordered and as applicable statutes and the federal Constitution require. Defendant complains that the documents the State gave in response to orders for discovery were too disjointed to be useful and that his repeated motions to compel discovery are evidence that the State violated the discovery statutes, the requirement that the essence of a statement be provided to a defendant, *see State v. Patterson*, 335 N.C. 437, 454, 439 S.E.2d 578, 588 (1994), and the spirit of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963). He finally contends that the delay in discovery hindered his ability to locate witnesses.

Our discovery statutes require the prosecutor "[t]o divulge, in written or recorded form, the substance of any oral statement relevant to the subject matter of the case made by the defendant, regard-

less of to whom the statement was made." N.C.G.S. § 15A-903(a)(2) (1997). "As used in the statute, 'substance' means: 'Essence; the material or essential part of a thing, as distinguished from "form." That which is essential.' " *State v. Bruce*, 315 N.C. 273, 280, 337 S.E.2d 510, 515 (1985) (quoting *Black's Law Dictionary* 1280 (5th ed. 1979)). Conversely, "form" is distinguishable from substance and "means the legal or technical manner or order to be observed in legal instruments or juridical proceedings." *Black's Law Dictionary* 651 (6th ed. 1990). Defendant complains solely about the form of the discovery provided. As in *Patterson*, 335 N.C. at 453-54, 439 S.E.2d at 588, the existence of defendant's statements was not repressed. Rather, the statements were not organized to his satisfaction. The names of witnesses, with exculpatory information, were included, and the substance of both inculpatory and exculpatory statements was present. Indeed, the final version of defendant's statements was separated by witness, denoted whether the witness was with law enforcement, and estimated a time frame if the statement was not in reference to the victim. This complied with the letter and spirit of the statutory mandate. *See State v. Strickland*, 346 N.C. 443, 457, 488 S.E.2d 194, 202 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 757 (1998). " '[T]he purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate.' " *Patterson*, 335 N.C. at 455, 439 S.E.2d at 589 (quoting *State v. Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990), *cert. denied*, 498 U.S. 1092, 112 L. Ed. 2d 1062 (1991)). Defendant clearly was afforded this protection by the substantive discovery provided. The State complied with its duty under N.C.G.S. § 15A-907 to render continuing discovery. Defendant received all of the discovery to which the statutes entitled him.

*Brady* holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218. Defendant has not indicated that the prosecution suppressed any evidence. He has merely asserted disjointed presentation of the statements. The final list of his statements was provided to his counsel well before trial and contained more than adequate demarcation of time and person. Moreover, defendant presented all of the allegedly exculpatory evidence for which he was unable to obtain testifying witnesses through witnesses who did testify. Therefore, any other evidence of which defendant might have been deprived was not material under the standard in *Kyles v. Whitley*, 514

U.S. 419, 131 L. Ed. 2d 490 (1995). Defendant received a "trial resulting in a verdict worthy of confidence." *Id.* at 434, 131 L. Ed. 2d at 506. There was no evidentiary suppression that " 'undermine[d] confidence in the outcome of the trial.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678, 87 L. Ed. 2d 481, 491 (1985)). Accordingly, this assignment of error is overruled.

Defendant next contends that evidence admitted regarding his abusive relationship with the victim was hearsay, inadmissible, and unduly prejudicial. He contends that the statements were not within the state-of-mind exception to the hearsay rule because they were recitations of facts or that they were too remote from the time of the crime to have relevance. Defendant asserts that even if the statements were admissible under the state-of-mind exception, the danger of unfair prejudice substantially outweighed their probative value.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Even relevant evidence is subject to Rule 403, which disallows evidence when the probative value is "outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1992); *see State v. Hardy*, 339 N.C. 207, 230-31, 451 S.E.2d 600, 613 (1994). Evidence of a defendant's misconduct toward his wife during the marriage is admissible "under Rule 404(b) to prove motive, opportunity, intent, preparation, [or] absence of mistake or accident with regard to the subsequent fatal attack upon her." *State v. Syriani*, 333 N.C. 350, 376, 428 S.E.2d 118, 132, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). However, if the evidence is used to prove the truth of the matter asserted, it must still be admissible under the rules against hearsay. *See Hardy*, 339 N.C. at 231-32, 451 S.E.2d at 614. If it is merely a recitation of facts, offered for the truth of the matter asserted, it is inadmissible. *See id.* at 229, 451 S.E.2d at 613.

[2] Defendant first contends that testimony from Lisa Carter that the victim said she was going home to Massachusetts for the summer, leaving the inference that the victim and defendant were separating, was improperly admitted. Competent evidence had been introduced that defendant had threatened to kill the victim if she left him. The victim's statement indicating the parties were separated or separating "bore directly on the relationship between the victim and defendant at the time of the killing and [was] relevant to show a motive for the

killing." *State v. Bishop*, 346 N.C. 365, 380, 488 S.E.2d 769, 776 (1997). Statements from the victim indicating that she intended to end the marriage reflected her state of mind and were therefore admissible under Rule 803(3). Defendant's contention that several witnesses should not have been allowed to testify as to the victim's statements of her intent to leave him are without merit.

[3] Defendant contends that Harry Callahan should not have been permitted to testify about a phone conversation in which the victim related that defendant had held a gun to her head. Callahan, the victim's brother-in-law, testified that the victim called him in November 1987; she was crying, and her voice was cracking. Callahan testified over objection that "[s]he said she was just—her and Eric Murillo had a fight and he held—held a gun to her head." This testimony indicates that the victim called her brother-in-law immediately after the incident, while she was still upset and had not had time to reflect. It thus was properly admitted as an excited utterance. N.C.G.S. § 8C-1, Rule 803(2) (1992); *State v. Smith*, 315 N.C. 76, 86-87, 337 S.E.2d 833, 841 (1985).

[4] Defendant complains that Bob Cannon, the victim's father, should not have been allowed to testify that the victim told him defendant beat her while they were on a beach trip or that defendant shot a gun next to the victim's head. The State incorrectly contends that Cannon's testimony was admissible to corroborate Callahan's admissible testimony of the events surrounding the victim's beating and abandonment at Carolina Beach and of the gun-to-head incident. Prior consistent statements of a witness are admissible for corroboration; this rationale, however, " 'does not justify admission of extrajudicial declarations of someone other than the witness purportedly being corroborated.' " *State v. Hunt*, 324 N.C. 343, 352, 378 S.E.2d 754, 759 (1989) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 52, at 243 (3d ed. 1988)). The extrajudicial statement of the victim to her father cannot corroborate Callahan's testimony about what the victim said to him. *See State v. Rose*, 335 N.C. 301, 321-22, 439 S.E.2d 518, 529 (hearsay statement of person other than the witness cannot be used to corroborate that witness' testimony), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994). However, the admission of this testimony was not prejudicial. Callahan testified extensively, competently, and with admissible exhibits about how he had to rent a room in Atlantic Beach for the distraught victim. The victim had contacted Callahan immediately after the beating because she had no money and needed a hotel room. Callahan testified that he

arranged to pay for the room and produced credit-card statements to prove it; clearly, evidence of the victim's call to him fell within the excited-utterance exception to the hearsay rule. *See* N.C.G.S. § 8C-1, Rule 803(2). Callahan's explanation of the gun-to-head incident was admissible as an excited utterance under Rule 803(2) as well. We thus are confident that Cannon's hearsay testimony of what the victim belatedly told him about these same events did not affect the verdict and that the error thus was not prejudicial. *See* N.C.G.S. § 15A-1443(a) (1997); *Bishop*, 346 N.C. at 381, 488 S.E.2d at 777.

[5] Defendant contends that Carolyn Carter, assistant principal at the victim's workplace, should not have been permitted to testify about beatings the victim described after the alleged abuse occurred. However, the transcript reveals that the victim recounted the past beatings only when confronted with her injuries. Carter testified that the victim "broke down" and explained what was happening in her life to make her afraid, upset, and bruised. The victim's explanatory comments about beatings "were made contemporaneously with and in explanation of the victim's statements" and crying, thus showing her state of mind. *State v. Westbrooks*, 345 N.C. 43, 60, 478 S.E.2d 483, 493 (1996). Accordingly, Carter's testimony was properly admitted.

[6] Defendant next contends that the victim's sisters and friends were improperly allowed to testify to various beatings that the victim described. In each instance, either the victim called the witness immediately after the beating, placing the statements within the Rule 803(2) excited-utterance exception to the hearsay rule, or she described the beatings as the bases for her fear, placing the statements within this Court's interpretation of the Rule 803(3) state-of-mind or -emotion exception. She referred to the incidents of abuse when explaining why she stayed with defendant and why she wanted to leave him. "The factual circumstances surrounding her statements of emotion serve only to demonstrate the basis for the emotions." *State v. Gray*, 347 N.C. 143, 173, 491 S.E.2d 538, 550 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 486 (1998). The victim told her family and friends about the beatings "contemporaneously with and in explanation of [her] statements," which showed her then-existing state of mind. *Westbrooks*, 345 N.C. at 60, 478 S.E.2d at 493. Accordingly, the testimony was properly admitted.

[7] Defendant next contends that Carolyn Dinekamp, a friend of the victim's, testified to inadmissible hearsay about a voice-activated recorder. Defendant asserts that Dinekamp's testimony that she gave the victim a voice-activated tape recorder to use to catch defendant

committing adultery was not relevant. However, the trial court found the existence of the tape, purportedly recording defendant having an affair, to be relevant to show the victim's intent to leave the defendant, and that, since there was competent evidence that defendant threatened to kill the victim if she left him, the tape was relevant to prove a motive for the murder. We agree. "[A] victim's state of mind is relevant if it relates directly to circumstances giving rise to a potential confrontation with the defendant." *State v. McLemore*, 343 N.C. 240, 246, 470 S.E.2d 2, 5 (1996). The testimony regarding existence of the tape therefore was properly admitted.

[8] Defendant next asserts various problems with Ella Ransom's testimony. We agree that Ransom's testimony that the victim told her she received a large bruise on her head when defendant threw her into a wall was improper. The victim was not upset, nor was she relating any feelings or intent regarding her relationship with defendant. The testimony therefore falls within *Hardy* as an improper recitation of mere remembered facts. *See Hardy*, 339 N.C. at 228, 451 S.E.2d at 612. However, the voluminous admissible testimony regarding violence directed toward the victim in the home renders this error harmless. *See Bishop*, 346 N.C. at 381, 488 S.E.2d at 777. Defendant's additional two assignments of error to Ransom's testimony also lack merit. Contrary to defendant's assertion, Ransom did not testify that defendant took the victim's paycheck but rather that the victim's paycheck was used to pay bills of the couple's two businesses. This evidence was tangential to the question of defendant's guilt, and there is no reasonable possibility of a different result if the testimony had been excluded. Therefore, any error was not prejudicial. *See id.*; *McLemore*, 343 N.C. at 246-47, 470 S.E.2d at 6. Finally, Ransom's testimony that the victim called defendant from work every day was based on her own observations. The victim's statement that she had to call defendant to reassure him that she was at work reflects her state of mind about her marriage and relates directly to an event that could cause a "confrontation with the defendant." *McLemore*, 343 N.C. at 246, 470 S.E.2d at 5. Admission of this testimony was not error.

[9] Defendant contends Mae Roberson's testimony that defendant came to the school to collect the victim's paychecks and that defendant determined whether the victim could drive a car was inadmissible hearsay. Defendant did not object to this testimony; it is therefore reviewable only for plain error. *See Gray*, 347 N.C. at 174, 491 S.E.2d at 551. We do not conclude that admission of this testi-

mony was such a basic or prejudicial error as to prevent justice from being done. *Id.*

**[10]** Sandra Reid, one of defendant's former employees, testified, over defendant's objection, that the victim had given part of her paycheck to a friend to create a "nest egg." Reid said, "She [the victim] was saving some money, she planned on leaving, and she gave Mark $200 to hold for her." This clearly reflects the victim's state of mind about her marriage, and the statements "related directly to circumstances giving rise to a potential confrontation with defendant." *State v. Corbett*, 339 N.C. 313, 332, 451 S.E.2d 252, 262 (1994). This testimony was properly admitted.

**[11]** Lisa Ryan, the victim's sister, testified about a beating the victim suffered at Thanksgiving 1988 and about the circumstances leading to the victim's final trip to Massachusetts to retrieve her sons. Ryan was allowed to testify that because the victim rubbed her brother-in-law's back, "it angered [defendant]. He said that she was flirting with my husband, and he beat her that night and there was a gun involved." This incident previously had been explored with competent testimony; thus, any error in the admission of this testimony was harmless. "Defendant cannot show that there is a reasonable possibility that the outcome of [his] trial would have been different if the trial court had excluded the [evidence] at issue." *Bishop*, 346 N.C. at 381, 488 S.E.2d at 777. Likewise, Ryan's testimony that defendant and the victim argued before the victim came to Massachusetts in 1992, if error, was harmless in light of the overwhelming competent evidence that defendant and the victim argued often and that defendant phoned the victim incessantly while she was in Massachusetts. Accordingly, the testimony did not prejudice defendant. The same analysis applies to defendant's contention that Claire Cannon's testimony to this event was improper. *Id.*

**[12]** The final witness about whose testimony defendant complains was Claire Cannon, the victim's mother. Cannon's testimony about an incident in which defendant held a gun to the victim's head was admissible for corroborative purposes, and the trial court properly instructed the jury on corroboration. Earlier, Deputy Phalen had testified that he responded to a domestic incident at defendant's home and contacted the victim's family because the victim wished to fly home to Massachusetts. Because the deputy had already testified competently to these facts and to his call to Cannon, Cannon's testimony was admissible for corroboration. *See State v. Alston*, 341 N.C.

198, 232-33, 461 S.E.2d 687, 705 (1995), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996). As noted, Cannon's testimony to the argument between defendant and the victim before the victim's trip to Massachusetts in 1992 was not prejudicial. The rest of Cannon's testimony was proper; it recounted excited utterances or the victim's state of mind. Accordingly, we find no error.

[13] Whether to exclude evidence under Rule 403 as more prejudicial than probative is within the sound discretion of the trial court. *See, e.g.*, *State v. Meekins*, 326 N.C. 689, 700, 392 S.E.2d 346, 352 (1990). Contrary to defendant's assertion, the evidence here was not overly prejudicial as subjecting defendant to trial for beating his wife. The evidence was admitted to show the escalating nature of his attacks and to rebut his claim that the killing was accidental. Testimony about a defendant-husband's arguments with, violence toward, and threats to his wife are properly admitted in his subsequent trial for her murder. *See Syriani*, 333 N.C. at 377, 428 S.E.2d at 132.

[14] Defendant contends finally that certain statements the victim made, admittedly falling within the state-of-mind exception, must nonetheless be excluded because of remoteness. We consistently have allowed evidence spanning the entire marriage when a husband is charged with murdering his wife in order " 'to show malice, intent and ill will towards the victim.' " *State v. Lynch*, 327 N.C. 210, 219, 393 S.E.2d 811, 816 (1990) (quoting *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985)). "Remoteness 'generally affects only the weight to be given . . . evidence, not its admissibility.' " *Syriani*, 333 N.C. at 377, 428 S.E.2d at 132 (quoting *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991)). Therefore, evidence of the entire pattern and history of violence between defendant and the victim was relevant. Defendant's assignment of error is meritless.

[15] In his third assignment of error, defendant contends that the trial court erred in admitting evidence of his first wife's death at his hands from a gunshot wound in 1970. He contends that this death was irrelevant to this case, was more prejudicial than probative if relevant, and was contrary to this Court's holding in *State v. Scott*, 331 N.C. 39, 42, 413 S.E.2d 787, 788 (1992). Defendant also challenges the propriety of the trial court's instructions regarding this evidence.

The State offered evidence that defendant's first wife, Debbie Kraft Murillo, was killed by a gunshot wound defendant inflicted in 1970. When defendant objected to this evidence, the trial court conducted an extensive *voir dire*. Evidence adduced tended to show that

defendant married his first wife when he was seventeen and she was fifteen, and they lived together in California. On the afternoon of 23 August 1970, defendant and Debbie were joking about Debbie's dog; defendant teased Debbie that he would shoot the dog. He chambered a "dud round" in his rifle and walked outside. Debbie followed him, and when Debbie picked up the dog, defendant followed her motion with the muzzle of the rifle. As Debbie turned with the dog, the rifle discharged. Defendant ran for help for his wife, but she died from a gunshot wound through the heart. There was no evidence of a struggle, and there was contradictory, but generally favorable, evidence from Debbie's family members about the happiness of the marriage. Defendant was charged with voluntary manslaughter; he pled guilty to involuntary manslaughter and was placed on probation. In later years defendant gave varying accounts of his first wife's death. In 1987 defendant applied for a Special Forces position with the Army and told the interviewing officer that Debbie was shot while she was in the kitchen and he was cleaning a gun in the living room. He made no mention of his role in loading a "dud round," nor did he mention pointing the gun at his wife and her dog. During the investigation of the present case, defendant told SBI Agent Van Parker that he did not know whether the police investigated Debbie's death. Defendant then told Parker that his first wife died when a hunting rifle accidentally discharged as he was cleaning it after a hunting trip.

The State also introduced evidence of defendant's own statements about Debbie's death. Rebecca Huggins, an acquaintance of both the victim in the present case and defendant, testified that in 1991 she was with defendant at his bar complaining about her husband cheating on her. Defendant responded that "he knew how it was because his first wife used to run around on him and she was a whore." Additionally, Bobby Cannon, brother of the victim here, testified that the victim told him in 1987 that defendant had held a gun to her head and told her, "I should shoot you in the head just like I did my first wife." Cannon testified that defendant told him during a telephone call while the victim was in Massachusetts:

I'll get her back. I will kill her or she will kill herself. It will—it won't happen right away, but it will happen. She's gotta pay me back first. She owes me. I got kicked out of the Army because of her. I've done it before and I'll do it again.

The trial court ruled that evidence of the shooting death of Debbie Kraft Murillo was admissible under Rule 404(b) and listed eight similarities between the deaths to support the decision:

One, each of the defendant's wives in these instances died as a result of one gunshot wound;

Two, the defendant was the person in the immediate company of both of the victims;

Three, that the defendant told each—told others that each of the shootings was an accident;

Four, that the defendant told others that he did not intend to shoot his wife;

Five, that a firearm was found near the location of each shooting;

Six, that the defendant sought help for each wife;

Seven, that the wound on each wife was to a vital organ;

Eight, that the shooting of each wife took place at the residence of the defendant and of the wife involved.

We agree that evidence of Debbie Kraft Murillo's death was admissible under Rule 404(b) and was relevant to show lack of accident in this case. As we said in *Stager*:

Rule 404(b) provides that evidence of prior similar acts is properly admissible so long as it is used to prove something other than the defendant's propensity or disposition to engage in like conduct. The one exception to that general rule of admissibility applies when the *only* probative value of the evidence is to show the defendant's propensity or disposition to commit offenses of the type charged.

*Stager*, 329 N.C. at 310, 406 S.E.2d at 894. As in *Stager*, the similarities between the deaths of defendant's two wives was indicative of intent and lack of accident. Similarities need not be bizarre or uncanny; they simply must "tend to support a *reasonable* inference that the same person committed both the earlier and later acts." *Id.* at 304, 406 S.E.2d at 891. In explaining why evidence of the *Stager* defendant's former husband's accidental shooting death was relevant to her trial for the shooting death of her most recent husband, this Court referred to the doctrine of chances as follows:

"In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, . . . [t]he

fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed."

*Id.* at 305, 406 S.E.2d at 891 (quoting Edward J. Imwinkelreid, *Uncharged Misconduct Evidence* § 5:05 (1984) (footnotes omitted)).

We recognize that, unlike in *Stager*, defendant's first wife's death had been ruled accidental. The trial court in this case, without objection, ruled that evidence of defendant's prior conviction was inadmissible unless he took the stand. Defendant was therefore free to argue that Debbie's death was purely accidental and that he was entirely free from culpability. His assertion, therefore, was exactly that of the defendant in *Stager*, that his first spouse's death was an accidental shooting. "Where, as here, an accident is alleged, evidence of similar acts is more probative than in cases in which an accident is not alleged." *Id.* at 304, 406 S.E.2d at 891.

Here the trial court told the jury that it could consider evidence of Debbie's shooting when deciding issues of intent, plan, premeditation, and absence of accident. Jurors were expressly warned not to consider the death as "proof of the defendant's propensity to commit the crime for which [he] is charged or as evidence of the defendant's character." Contrary to defendant's reading of *Stager*, similarities such as those between the deaths of Debbie and the victim here may be used to support a finding of intent. *See id.* at 307, 406 S.E.2d at 892-93. The trial court here properly explained to the jury, using agreed-upon instructions, that intent is part of premeditation. *See State v. Crawford*, 344 N.C. 65, 74, 472 S.E.2d 920, 926 (1996). We therefore reject defendant's arguments regarding the trial court's charge to the jury. Debbie Murillo's death was evidence of a similar act, and it was probative of whether defendant accidentally killed two of his four wives. The evidence was properly admitted to show lack of accident and to support a finding that defendant intended to kill the victim here.

Because evidence of Debbie's death was allowed to show, *inter alia*, lack of accident, defendant's reliance on *State v. Morgan*, 315 N.C. 626, 638, 340 S.E.2d 84, 92 (1986), is misplaced. Rule 404(b) evidence is allowed so long as its probative value is not limited to showing propensity to commit a crime; this remains true even if the evidence tends also to show some other act or propensity or to defeat a claim of self-defense. *See State v. Hipps*, 348 N.C. 377, 404, 501 S.E.2d 625, 641 (1998).

**[16]** Defendant complains that the evidence of the death of his first wife is probative only if one ignores his involuntary-manslaughter conviction and supposes that he murdered his first wife and escaped punishment. Consequently, he argues that admitting evidence of the first wife's death subjects him to double jeopardy, relying on *State v. Scott*, 331 N.C. 39, 413 S.E.2d 787. We disagree. *Scott* involved evidence of a prior criminal charge of which the defendant was acquitted, yet the jury was instructed to consider the evidence "on the issue of defendant's 'intent, knowledge, plan, scheme, or design.' " *Id.* at 41, 413 S.E.2d at 788. Several distinctions are obvious.

First, defendant here pled guilty to manslaughter and therefore stands *convicted* of that crime. *See, e.g.*, N.C.G.S. § 15A-1331(b) (1997); *State v. Sidberry*, 337 N.C. 779, 782, 448 S.E.2d 798, 800 (1994). A prior conviction may be a bad act for purposes of Rule 404(b) if substantial evidence supports a finding that defendant committed both acts, and the "probative value is not limited *solely* to tending to establish the defendant's propensity to commit a crime such as the crime charged." *Stager*, 329 N.C. at 303, 406 S.E.2d at 890. The trial court here conducted an extensive *voir dire* to determine whether the deaths of defendant's two wives were sufficiently similar to support an inference by the jury that defendant committed both acts. We hold that substantial evidence was presented from which a jury could determine that defendant committed the similar act, and the evidence was properly admitted.

Second, the evidence of Debbie's death was not admitted to show only intent, plan, or motive. In *Scott* the State introduced evidence that the defendant had raped a woman two years earlier after meeting her at the same convenience store where he met his current victim. In the prior rape case, the defendant had been acquitted after claiming consent. Therefore, this Court held it was prejudicial to introduce his prior "rape" as evidence of a scheme or plan in his current rape prosecution. We held it to be error and violative of Rule 403 as a matter of law to introduce evidence of a prior alleged offense for which a defendant "has been tried and acquitted . . . when its probative value depends, as it did here, upon the proposition that defendant in fact committed the prior crime." *Scott*, 331 N.C. at 42, 413 S.E.2d at 788.

Here, however, defendant was not acquitted of the prior crime which was argued to the jury, so *Scott* does not control. *See State v. Lynch*, 337 N.C. 415, 419, 445 S.E.2d 581, 582 (1994) (interpreting

STATE v. MURILLO

[349 N.C. 573 (1998)]

*Scott* to apply only to cases with prior acquittals). Further, the probative value of Debbie's death does not depend on any additional fact or element not present in defendant's conviction. Defendant's claim of accident in Debbie's death was argued to the jury as making more incredulous his claim of accident in the shooting death of the victim here. "[T]he more often a defendant performs a certain act, the less likely it is that the defendant acted innocently." *Stager*, 329 N.C. at 305, 406 S.E.2d at 891. We note that defendant himself made statements to the victim and her brother, Bobby Cannon, before the victim's death, indicating that he had killed his first wife intentionally. On the day of the victim's death, defendant angrily complained to his employee, Kendal Breedlove, in reference to the drive to the hospital the night before, "The bitch s— in my truck." When asked if he was worried about what people would say about his wife's death, defendant told Breedlove, "I could walk through a pile of s— and come out smelling like a bed of roses." Clearly, defendant's own statements call into question his assertion of accident in both wives' deaths.

Finally, "[w]hether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court." *Id.* at 308, 406 S.E.2d at 893. In light of the extensive *voir dire* and the findings of fact by the trial court, we find no abuse of discretion in allowing the evidence regarding Debbie Kraft Murillo's death. Further, the death was not so remote in time as to have lost its probative value or be more prejudicial than probative. *See id.* at 307, 406 S.E.2d at 893. Accordingly, defendant's third assignment of error is overruled.

[17] In his fourth assignment of error, defendant contends that his federal and state constitutional rights to be present at all stages of his capital trial were violated by three recorded bench conferences. This issue was decided contrary to defendant's position in *State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832 (1991). In *Buchanan* this Court determined that a defendant's federal constitutional rights are not violated when, as here, he makes no request to be present at the bench conferences, and his attorneys are present to represent and protect his interests. *See id.* at 215, 410 S.E.2d at 839-40. We follow *Buchanan* and hold that defendant's right under the federal Constitution to be present was not violated.

Defendant also asserts that his rights under Article I, Section 23 of the North Carolina Constitution were violated. Defendant bears the burden "to show the usefulness of his presence in order to prove a violation of his right to presence." *Id.* at 224, 410 S.E.2d at 845.

STATE v. MURILLO

[349 N.C. 573 (1998)]

"Once the defendant meets this burden, the burden shifts to the State to establish that the error is harmless beyond a reasonable doubt." *State v. Neal*, 346 N.C. 608, 616, 487 S.E.2d 734, 739 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 131 (1998).

[A] defendant's state constitutional right to be present at all stages of his capital trial is not violated when, with defendant present in the courtroom, the trial court conducts bench conferences, even though unrecorded, with counsel for both parties.

*Buchanan*, 330 N.C. at 223, 410 S.E.2d at 845.

Defendant complains that his right to be present was violated by three recorded bench conferences with his attorneys and attorneys for the State. Defendant contends that the first bench conference regarding dismissal of a sick juror and seating of an alternate juror violated his right to be present because he "could have related to his attorneys his observance of this juror." This conference was partly in open court outside the jury's presence and partly at the bench. The second and third conferences, regarding whether opening arguments had referred to the victim's performance as a teacher and whether the victim and her sister were the same size such that a demonstration was proper, were held with defendant's counsel present at the bench and defendant in the courtroom. At all times defendant either had actual knowledge of the substance of the discussion or had constructive notice through his attorneys. As in *Buchanan*, "defendant, through his attorneys, had every opportunity to inform the court of his position and to contest any action the court might have taken." *Id.* Defendant makes no showing that his presence at the bench would have been useful; under *Buchanan*, his rights were not violated by the bench conferences. *See also State v. Robinson*, 346 N.C. 586, 601-02, 488 S.E.2d 174, 184 (1997). This assignment of error is without merit.

[18] In his fifth assignment of error, defendant asserts that the trial court committed constitutional error in failing to excuse *ex mero motu* two jurors who inadvertently and fleetingly entered the courtroom during hearings. The record indicates that there was actually only one juror involved. The first alleged misconduct was during a *voir dire* about evidence of Debbie Kraft Murillo's death, and it appears in the transcript as follows:

[PROSECUTOR]: In that it did not happen the way the defendant said it happened. If I may refer to Ms. Kraft's testimony before

your Honor, the day after the incident, when Ms. Kraft talked to the defendant, he was talking about Deborah holding the dog over her head. You may remember her holding her hands up like this (demonstrating) and then he shoots her.

(Juror, Mr. Dowless, entering courtroom.)

THE COURT: Wait just a second. You may step out in the hall.

(Juror, Mr. Dowless, exiting courtroom.)

[PROSECUTOR]: Within three days, he tells Mr. Quinn . . . .

The second was during a hearing about a witness' written statement. It appears in the transcript as follows:

[PROSECUTOR]: You have instructed already for us to review this again. We will go back and review again, making sure that every one that we have found to be—have exculpatory information, that it is properly worded, properly paragraphed, and we will turn that over. If there's any change at all, we will make it known immediately to defense counsel.

(Juror, Mr. Dowless, opening the door to jury room.)

THE COURT: Just—just a moment. Sir, if you can wait just a minute.

(Juror, Mr. Dowless, complying with request and remaining in the jury room.)

THE COURT: That's another issue we're gonna have to deal with before we get around to deliberations.

[DEFENSE COUNSEL]: What—what is the harm, at this point, after this showing? We're not asking to allow us to go . . . .

The final instance occurred during a *voir dire* about a police report. It appears in the transcript as follows:

[PROSECUTRIX]: Your Honor, my understanding is the Sheriff's Department policy is to type up some of the information which is included on the handwritten form and that—that the typewritten form is kept in a computer and we just have copies of both of them.

(Juror, Mr. Dallas [sic], opening door to jury room.)

THE COURT: You can step out in hall. Hold on just a second.

STATE v. MURILLO

[349 N.C. 573 (1998)]

(Juror, Mr. Dallas [sic], complying with request.)

THE COURT: If we can make a copy of that for the record—

[DEFENSE COUNSEL]: Surely.

No juror named "Dallas" was seated for this trial. We thus assume that the juror referred to is again Dowless.

"The determination of the existence and effect of jury misconduct is primarily for the trial court whose decision will be given great weight on appeal." *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991). This Court gives trial courts "the responsibility to conduct investigations to this effect, including examination of jurors when warranted, to determine whether any misconduct has occurred and has prejudiced the defendant" when allegations of misconduct are made. *State v. Barnes*, 345 N.C. 184, 226, 481 S.E.2d 44, 67, *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 134 (1997), *and cert. denied,* —— U.S. ——, 140 L. Ed. 2d 473 (1998). The trial court retains sound discretion over the scope of any such inquiry. *State v. Willis*, 332 N.C. 151, 173, 420 S.E.2d 158, 168 (1992).

In previous cases there was some evidence that misconduct had occurred outside the presence of the court. "An inquiry into possible misconduct is generally required only where there are reports indicating that some prejudicial conduct has taken place." *Barnes*, 345 N.C. at 226, 481 S.E.2d at 67. In *Willis*, for example, we held that when outside contact with a juror is shown, the trial court must "determine whether such contact resulted in substantial and irreparable prejudice to the defendant." *Willis*, 332 N.C. at 173, 420 S.E.2d at 168. What action to take on a motion for a new trial is then within the court's discretion.

"The circumstances must be such as not merely to put suspicion on the verdict, because there was opportunity and a chance for misconduct, but that there was in fact misconduct. When there is merely matter of suspicion, it is purely a matter in the discretion of the presiding judge."

*State v. Johnson*, 295 N.C. 227, 234-35, 244 S.E.2d 391, 396 (1978) (quoting *Lewis v. Fountain*, 168 N.C. 277, 279, 84 S.E. 278, 279 (1915)).

We note first that no motion was made for a new trial based on juror misconduct. We have held that there is no absolute affirmative duty to investigate juror conduct absent reports of prejudicial con-

duct. *See State v. Harrington*, 335 N.C. 105, 115, 436 S.E.2d 235, 240-41 (1993). Both the existence of misconduct and the effect of misconduct are determinations within the trial court's discretion. *See id.* at 115-16, 436 S.E.2d at 241. The trial court here witnessed all of the events in question. Neither party moved for a hearing or for a further inquiry into what juror Dowless might have overheard; both simply continued with their arguments. Further, any discussion juror Dowless might have overheard was either eventually allowed before the jury (the first instance) or tangential to the issues (the second and third instances). We conclude that the trial court did not abuse its discretion in not excusing juror Dowless *ex mero motu* for juror misconduct. Accordingly, this assignment of error is overruled.

[19] In his sixth assignment of error, defendant contends the trial court erroneously admitted certain evidence. He first contends that the trial court should not have allowed, over his objection, character evidence concerning the victim's performance as a school teacher. The trial court held a *voir dire* regarding this evidence and concluded that it was relevant to rebut the contention raised in defendant's opening statement that the victim was an irresponsible alcoholic. "Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case." *State v. Sloan*, 316 N.C. 714, 724, 343 S.E.2d 527, 533 (1986); *see also* N.C.G.S. § 8C-1, Rule 401. We have held that

> "in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible. It is not required that evidence bear directly on the question in issue, and evidence is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably allows the jury to draw an inference as to a disputed fact."

*State v. Jones*, 336 N.C. 229, 243, 443 S.E.2d 48, 54 (quoting *State v. Arnold*, 284 N.C. 41, 47-48, 199 S.E.2d 423, 427 (1973)) (citations omitted in original), *cert. denied*, 513 U.S. 1003, 130 L. Ed. 2d 423 (1994). The trial court here evaluated the evidence for its probative value and determined that the victim's teaching performance, testified to by professional colleagues who worked with her on a regular basis, was relevant to rebut contentions in defendant's opening statement that the victim was a violent alcoholic whose abusive behavior was not limited to defendant. This determination was well within the bounds of the trial court's discretion. *See State v. Jones*, 342 N.C. 457, 464,

466 S.E.2d 696, 699, *cert. denied,* 518 U.S. 1010, 135 L. Ed. 2d 1058 (1996). Accordingly, we find no error.

**[20]** Defendant next contends the trial court erred in overruling his objection to a demonstration by the victim's sister, Paula Callahan. After testifying that she and the victim wore the same clothes and were the same size, Callahan demonstrated for the jury that her forearm and head could not be positioned such that the bullet holes matched as they did in the victim's body if an accident had occurred in the way defendant claimed. She based this demonstration on autopsy photos of the victim. Defendant contends this demonstration was not necessary for the trier of fact and that Callahan could easily have faked her inability to position her body. He argues that the demonstration was unduly prejudicial under Rule 403.

Where, as here, the asserted defense is accident, a demonstration tends to "make the existence of [a] fact that is of consequence . . . more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401. The decision of whether to exclude relevant evidence under Rule 403 rests in the discretion of the trial court. *See State v. Coffey,* 326 N.C. 268, 281, 389 S.E.2d 48, 56 (1990). The trial court conducted a *voir dire* and evaluated the probative and prejudicial value of the demonstration. Having determined it to have been conducted under conditions that were reasonably similar, to be helpful, and not to be overly prejudicial, the trial court determined that the evidence was admissible. We find no abuse of discretion and overrule defendant's assignment of error.

Defendant next contends that evidence of the voice-activated recorder given to the victim by Carolyn Dinekamp violated Rules 401 through 403. As previously determined in considering defendant's second assignment of error, this evidence was relevant to show the victim's state of mind. The exclusion of relevant evidence under Rule 403 rests in the trial court's discretion. *See id.* We find no abuse of that discretion here. This argument is without merit.

**[21]** Defendant further contends that the trial court erroneously sustained the State's objection to defense counsel's cross-examination of Keith Hanson, the victim's minor son. Defendant asserts that the failure to allow impeachment of the witness with a prior inconsistent statement violates N.C.G.S. § 8C-1, Rule 607. Hanson testified at trial that defendant looked angry immediately before the shooting; no such description was present in the statement he made to police officers immediately after the shooting. The State objected to defense

counsel's question, "Now, you did not tell Detective Underwood that, did you?" The objection was based on the detective's having "barely talked to the boys because they were traumatized." The trial court sustained the objection.

Ordinarily, "the scope of cross-examination is subject to appropriate control in the sound discretion of the court." *Id.* at 290, 389 S.E.2d at 61. It "is not ground for reversal unless the cross-examination is shown to have improperly influenced the verdict." *State v. Woods*, 345 N.C. 294, 307, 480 S.E.2d 647, 653, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 132 (1997). Hanson had already read to the jury the statement he gave to Detective Underwood. Thus, when the trial court sustained the State's objection, Hanson had already presented the jury with the very evidence defendant sought to elicit in asking Hanson whether he told Detective Underwood that defendant looked angry. Because the State's objection could have been sustained for repetitiveness, we find no abuse of discretion. *See State v. Jaynes*, 342 N.C. 249, 279-80, 464 S.E.2d 448, 467 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). Accordingly, this argument is without merit.

[22] Next, defendant contends that the trial court improperly limited his evidence that his marriage to Debbie Kraft Murillo was happy. Defendant sought to introduce photographs and testimony rebutting the claim of State's witnesses that the apartment defendant shared with his first wife had bullet holes in the walls. He contends the photographs taken eight months before Debbie was killed were relevant to rebut the State's evidence and were necessary to his defense.

After hearing arguments from both attorneys regarding the probative value and prejudicial effect of photographs of Debbie, her sisters, her dog, and defendant, the court allowed the majority of the photos to rebut various contentions of family animosity that were raised by the testimony of Debbie's stepmother. It determined that some could be used to illustrate testimony of the persons pictured. Because no one could testify to taking the pictures of the walls and because they were not necessary or sufficiently dated to illustrate testimony of witnesses who denied seeing bullet holes in the walls, the photos of the walls were disallowed.

"Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court." *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56. Rule 403 allows the exclusion of relevant evidence that is probative but poses greater danger of confusing the issues, mis-

leading the jury, or being cumulative. *See* N.C.G.S. § 8C-1, Rule 403. The trial court here exercised proper discretion to exclude unreliable photographs, taken at an indeterminate date, that could have been more confusing or misleading than probative. Defendant presented numerous witnesses who testified that he had a happy marriage with Debbie. He has not shown an abuse of discretion by the trial court in excluding these photographs, nor has he shown that he was unable to present a defense without the excluded photographs. This argument is without merit.

In his seventh assignment of error, defendant contends the evidence was insufficient to support his murder conviction based on premeditation and deliberation. He argues that without allegedly inadmissible prejudicial evidence, the jury would not have returned a conviction. He asserts that the uncontroverted facts raise only a suspicion or conjecture that he killed his wife; therefore, his conviction cannot stand under *State v. Lee*, 287 N.C. 536, 215 S.E.2d 146 (1975).

For reasons stated above, defendant's contentions that inadmissible evidence was presented during his trial and prejudiced him are without merit. The evidence presented supports a conviction for premeditated and deliberate murder. This assignment of error is overruled.

[23] In his eighth assignment of error, defendant asserts that the trial court should have intervened *ex mero motu* several times during the prosecutors' closing arguments in the guilt phase. Defendant asserts that the prosecutor asked the jury to find him guilty of first-degree murder because he "got away with it" in the death of Debbie Murillo. Defendant contends that the arguments that he "got away with" something were inherently unfair because the prosecutor knew of defendant's previous conviction for Debbie's death. The trial court had previously ruled, without objection, that evidence of defendant's conviction would be inadmissible unless defendant took the stand. Thus, under *State v. Locklear*, 294 N.C. 210, 241 S.E.2d 65 (1978), the prosecutor should not have argued that defendant "got away with" anything. Defendant contends that this argument was grossly improper and that the trial court abused its discretion in failing to intervene *ex mero motu*.

" 'Argument of counsel is largely within the control and discretion of the trial judge. Counsel must be allowed wide latitude in the argument of hotly contested cases.' " *State v. Brogden*, 329 N.C. 534,

549, 407 S.E.2d 158, 168 (1991) (quoting *State v. Lynch*, 300 N.C. 534, 551, 268 S.E.2d 161, 171 (1980)). Because defendant did not object,

> "the standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial."

*State v. Gaines*, 345 N.C. 647, 673, 483 S.E.2d 396, 412 (quoting *State v. Alford*, 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995)), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997).

The trial court had already determined that evidence of Debbie's death was admissible to show intent and lack of accident under Rule 404(b). We have held that this was proper. A review of closing arguments in the guilt phase reveals that the prosecutors did no more than indicate similarities between the two wives' deaths and argue the improbability that an expert shooter would accidentally shoot and kill two of his four wives. These are reasonable inferences from the evidence presented and therefore were proper arguments. *See id.* at 675, 483 S.E.2d at 413. This assignment of error is without merit.

**[24]** Defendant next contends that the prosecutor impermissibly argued that defendant's forensic expert, Robert Kopec, was paid to lie on the stand. He assigns error to the following argument:

> [SBI Agent] Tom Trochum said no one identifies stippling from a photograph. It is improper, it is unscientific, and it leads to erroneous results, which is exactly what Kopec testified to you. An erroneous result. It is a sad state of our legal system, that when you need someone to say something, you can find them. You can pay them enough and they'll say it.

Defendant cites the Court of Appeals' decision in *State v. Vines*, 105 N.C. App. 147, 412 S.E.2d 156 (1992), to support his argument. However, even in *Vines*, where the Court of Appeals found gross impropriety in the prosecutrix's argument that "[y]ou can get a doctor to say just about anything these days" and in her insinuation that the expert was motivated by "pay," the court determined that a new trial was not warranted in light of the overwhelming case against the defendant. *See id.* at 156, 412 S.E.2d at 162-63. When we have analyzed closing arguments in sentencing proceedings and referred to *Vines*, we have assumed *arguendo* that the statements were error but held them not prejudicial error requiring a new sentencing proceeding. *See State v. Hill*, 347 N.C. 275, 300, 493 S.E.2d 264, 278

(1997) (assuming error *arguendo* in statement that mitigators "were developed skillfully by the defense experts who go around this State testifying for defendants in capital cases, selling their services and opinions at rates from $75 to $125 an hour," but finding no entitlement to new sentencing proceeding), *cert. denied,* ―― U.S. ――, 140 L. Ed. 2d 1099 (1998); *State v. Spruill,* 338 N.C. 612, 652, 452 S.E.2d 279, 300 (1994) (assuming error *arguendo* in statement, "You know, he's been paid, you know darn well he did," but finding no entitlement to new sentencing proceeding), *cert. denied,* 516 U.S. 834, 133 L. Ed. 2d 63 (1995). While these cases are instructive, they are not controlling because the challenged arguments here were during the guilt phase of defendant's trial.

"[T]his Court has consistently held that 'an expert witness' compensation is a permissible cross-examination subject to test partiality towards the party by whom the expert was called.' " *State v. Brown,* 335 N.C. 477, 493, 439 S.E.2d 589, 598-99 (1994) (quoting *State v. Allen,* 322 N.C. 176, 195, 367 S.E.2d 626, 636 (1988)). Therefore, evidence that defendant paid the expert was proper; the question is whether it was a proper subject in the closing argument. "[I]t is not improper for the prosecutor to impeach the credibility of an expert during his closing argument." *State v. Norwood,* 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), *cert. denied,* ―― U.S. ――, 137 L. Ed. 2d 500 (1997). In assessing the propriety of references to payment of expert witnesses in guilt-phase closing arguments, this Court has relied on common knowledge. We have found no error even when defendant had objected during the arguments. For example, we said:

> The prosecutor also argued that the psychiatrist admitted in his testimony that "he was hired for the sole purpose to form this intoxication defense." Although the record does not show the psychiatrist testified he was hired to form a defense, it is evident this was the reason he was employed.
>
> We hold that the defendant was not unfairly prejudiced by the prosecutor's argument.

*State v. Jones,* 339 N.C. 114, 150, 451 S.E.2d 826, 845 (1994), *cert. denied,* 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). Likewise, in approving an argument by a prosecutor that a defendant's mother "has tried to color this as best she can in the light that is most favorable to [her son;] I mean a mother would do that," we found no prejudicial error because "[i]t is a matter of common knowledge that a mother will likely shade her testimony favorably for her son." *State v. Harris,* 338

N.C. 129, 147, 449 S.E.2d 371, 379 (1994), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995).

In light of our previous holdings, we cannot conclude that the prosecutor's arguments were so grossly improper as to require the trial court to intervene *ex mero motu* when, at trial, defense counsel apparently did not believe the argument was prejudicial. *See State v. Campbell*, 340 N.C. 612, 630, 460 S.E.2d 144, 153 (1995), *cert. denied*, 516 U.S. 1128, 133 L. Ed. 2d 871 (1996). Further, even assuming *arguendo* that this portion of the argument was improper, it was not prejudicial to defendant in light of the substantial evidence of his guilt. *See id.* at 631, 460 S.E.2d at 154. This assignment of error is overruled.

[25] In his ninth assignment of error, defendant contends that the trial court erred in allowing the prosecution's improper closing arguments during the sentencing phase. He contends the trial court erroneously overruled defendant's objection to one improper argument and erroneously failed to intervene *ex mero motu* in other improper arguments. Although defendant asserts constitutional claims regarding the closing arguments, he "made no constitutional claims at trial concerning the State's closing arguments and will not be heard on any constitutional grounds now." *Barnes*, 345 N.C. at 237, 481 S.E.2d at 73; *see* N.C. R. App. P. 10 (b)(1). Preliminarily, we note that "trial counsel are granted wide latitude in the scope of jury argument, and control of closing arguments is in the discretion of the trial court." *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487-88 (1992).

The only evidence the State presented at sentencing was a certified copy of defendant's record from California with the relevant statute attached. The record, detailing defendant's conviction for the 1970 death of his first wife, showed that the involuntary manslaughter charge was dismissed within one year of defendant's guilty plea. Defendant asserts that it was error for the prosecutrix to tell the jury that dismissals of felony convictions happen all the time. He says the arguments were designed to "denigrate the seriousness that the California judicial system placed on defendant's role" in the shooting of Debbie Murillo.

In *Barnes* we held that defendant's allegation that the prosecutor misstated the law regarding mitigators was not error because the arguments had to be viewed in context and as a whole. *See Barnes*, 345 N.C. at 239, 481 S.E.2d at 75. Here defendant asserts that the prosecutrix misstated the law regarding the sole aggravator by telling the

STATE v. MURILLO

[349 N.C. 573 (1998)]

jury that dismissals such as defendant's are commonplace. Viewing the argument as a whole, however, we conclude that the prosecutrix was explaining why defendant's California conviction still counted as a conviction for purposes of the jury's finding the aggravating circumstance contained in N.C.G.S. § 15A-2000(e)(3) (prior violent felony). The prosecutrix explained how a dismissal may occur and when a dismissal must occur, and illustrated that the dismissal was not an exoneration by referring to several cases. As in *Barnes*, when viewed as a whole, "the argument was correct, and defendant was not prejudiced." *Id.* Further, even if this statement was error, defendant suffered no prejudice from it. Defense counsel was free to argue, and in fact did argue at sentencing, that not all convictions are set aside and that certain conditions must be met for that to occur. Accordingly, this assignment of error is overruled.

[26] Defendant also assigns as error sentencing-phase closing arguments to which he did not object. Our inquiry is as to whether the remarks were "so grossly improper as to require the trial court to intervene *ex mero motu.*" *Bishop*, 346 N.C. at 395, 488 S.E.2d at 785. Defendant contends that the prosecutor impermissibly asked the jury to find that some of the nonstatutory mitigators were in fact aggravators. He argues that the following argument required *ex mero motu* intervention:

> Beth Murillo had previously threatened the defendant. Beth Murillo also said that she didn't mean it. Beth said, "I could never do that. I would kill myself first." And I submit to you, if Beth Murillo had been treated like a woman and a lady by a gentle, loving, and caring husband, she would never have even gotten to the point of even uttering such things. But it was Beth that was receiving, especially toward the end of her life, these murderous threats, "Shall I kill you today or shall I wait?"
>
> Mitigating circumstance, members of the jury, for him? What value could you assign to that? Or should it actually go against him? Should it actually be considered against him?
>
> Beth Murillo threatened the defendant that night. The same argument, members of the jury . . . .

Viewing the argument as a whole, *see State v. Ingle*, 336 N.C. 617, 646, 445 S.E.2d 880, 895 (1994), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995), we conclude that the prosecutor merely argued the weight of the nonstatutory mitigating circumstances.

This Court has consistently held that when a jury determines that a *statutory* mitigating circumstance exists, it is not free to refuse to consider the circumstance and must give it some weight in its final sentencing determinations, but the amount of weight any circumstance may be given is a matter left to the jury. We have also consistently held, however, that it is for the jury to determine whether submitted *nonstatutory* mitigating circumstances established by the evidence should be given any mitigating value. As a matter of law, *nonstatutory* mitigating circumstances are mitigating only when one or more jurors deem them to be so.

*State v. Keel,* 337 N.C. 469, 495, 447 S.E.2d 748, 762-63 (1994) (citations omitted), *cert. denied,* 513 U.S. 1198, 131 L. Ed. 2d 147 (1995). A prosecutor may argue the weight to be given to mitigators in his arguments at sentencing. *See State v. Walls,* 342 N.C. 1, 57, 463 S.E.2d 738, 768 (1995), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 794 (1996); *State v. Craig,* 308 N.C. 446, 460, 302 S.E.2d 740, 749, *cert. denied,* 464 U.S. 908, 78 L. Ed. 2d 247 (1983). Here the prosecutor argued that the nonstatutory mitigating circumstances should not weigh heavily in the jurors' minds. There was no additional submission of aggravators; indeed, the prosecution in closing arguments emphasized that only one aggravator was being submitted to the jury. There was no error in the argument and certainly none that would require the trial court to intervene *ex mero motu. See State v. Geddie,* 345 N.C. 73, 100, 478 S.E.2d 146, 160 (1996), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 43 (1997).

[27] Defendant next contends that the prosecutor impermissibly argued for imposition of the death penalty because it will deter crime generally, citing the following argument:

America has been confronted, at various stages in its history, with various crises. America's had to fight evil in various places in various ways. We've had to have a fighting for principles, for justice, for decency, for law and for order. World War II, our young men and women had to go off and they had to fight for the principle of liberty against wickedness. Various other wars. And today, America has to fight for principles of decency and liberty within its own boundaries because of the crime.

Today, look at where we are, where the decent people are literally imprisoned in their homes, not safe in the streets. And you are the ones that can send a message out of [sic]: We will stand

up, we will have our women and children and men able to walk around free and in safety. It doesn't get fixed without Americans being willing to take the duty that they are required to take under the law, that you said you were willing to take.

We disagree with defendant's characterization of this argument.

This Court has upheld closing arguments reminding jurors that they were "the conscience of the community." *State v. Moseley*, 338 N.C. 1, 52-53, 449 S.E.2d 412, 443 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). In *Walls* we approved a closing argument in a capital-sentencing proceeding that urged jurors to "send a thunderous message to anybody who would think about committing such a wicked, evil, heinous act in the borders of the county." *Walls*, 342 N.C. at 61-62, 463 S.E.2d at 770-71. We previously have distinguished the arguments in *State v. Scott*, 314 N.C. 309, 333 S.E.2d 296 (1985) (improper to ask the jury to lend an ear to the community), on which defendant relies, from arguments such as those here. In *Quesinberry* we approved a closing argument, saying, "[h]ere, instead, the prosecutor asked the jury to send a message to the community, not to 'lend an ear to the community.'" *State v. Quesinberry*, 325 N.C. 125, 141, 381 S.E.2d 681, 691 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). Here the prosecutor was reminding the jury of its role and obligation to follow the law in sentencing defendant. The argument did not impermissibly cite to general deterrence, and the prosecutor stayed within the bounds this Court has established when the prosecutor is arguing zealously for the highest penalty. Accordingly, this argument is without merit.

[28] Finally, defendant argues that the prosecutor impermissibly told the jury that the law does not permit sympathy in its consideration of a proper penalty. Defendant asserts error in the following argument:

I suggest to you, this is not a matter for sympathy or prejudice at this time. This is a matter for you to look at what you have seen. It is wickedness. Don't let the wickedness spread like a bay tree. Cut it down. It is evil. What you have heard is evil to the core. Like a rattlesnake. Get rid of it, members of the jury. And if you follow the law, that's what you will do. There's no question about it.

Although the trial court may not preclude the jury from considering compassion, "the prosecutor may discourage the jury from having

mere sympathy not related to the evidence in the case affect its deci-
sion. Such statements are consistent with the prosecutor's role in
seeking a recommendation of death." *State v. Rouse*, 339 N.C. 59, 93,
451 S.E.2d 543, 561 (1994) (citations omitted), *cert. denied*, 516 U.S.
832, 133 L. Ed. 2d 60 (1995). Moreover, the prosecutor here did not
tell the jury it could not consider sympathy; rather, he suggested that
the jury should not consider sympathy and should instead focus on
the facts. This was not a misstatement of the law and "was well
within the wide latitude permitted to prosecutors in their arguments."
*State v. Richmond*, 347 N.C. 412, 443, 495 S.E.2d 677, 694, *cert.
denied*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3232 (1998).
Accordingly, this assignment of error is overruled.

[29] In defendant's tenth assignment of error, he contends that sub-
mission of the (e)(3) aggravating circumstance was improper. *See*
N.C.G.S. § 15A-2000(e)(3) (1988) (amended 1994). Defendant asserts
that although California law allows a dismissed conviction to be pled
and proved in a subsequent prosecution, no cases do so when the
prior conviction was twenty-two years earlier. Further, he contends
that because California capital-sentencing law does not consider a
conviction of involuntary manslaughter as an aggravating circum-
stance, it is unfair to use his California conviction thereof to aggra-
vate his sentence in this case. Finally, he contends that using the prior
California conviction in this sentencing defeats the purpose of the
California legislature in allowing dismissals. He cites *State v.
Calloway*, 305 N.C. 747, 291 S.E.2d 622 (1982), for the proposition
that since the sole aggravator was submitted in error, his death
sentence must be vacated.

Under North Carolina law the jury may consider a conviction for
involuntary manslaughter as an aggravating circumstance. *See*
N.C.G.S. § 15A-2000(e)(3); *Keel*, 337 N.C. at 490-91, 447 S.E.2d at 760.
The fact that the conviction originated in another state does not pre-
clude our courts from submitting it under (e)(3). *See State v. Taylor*,
304 N.C. 249, 278-79, 283 S.E.2d 761, 780 (1981), *cert. denied*, 463 U.S.
1213, 77 L. Ed. 2d 1398 (1983). Defendant concedes that California
law, under which he was convicted, allows a dismissed conviction to
be pled and proved in any subsequent prosecution. *See People v.
Majado*, 22 Cal. App. 2d 323, 325-26, 70 P.2d 1015, 1016 (1937). He
does not argue any effect that the dismissal may have on North
Carolina's sentencing procedures. Instead, defendant contends that
the conviction for involuntary manslaughter was too remote in time
to be used to enhance a subsequent conviction. We disagree.

STATE v. MURILLO

[349 N.C. 573 (1998)]

We recently reiterated the requirements for consideration of a prior conviction under the (e)(3) aggravator. N.C.G.S. § 15A-2000(e)(3)

> "requires that there be evidence that (1) defendant had been convicted of a felony, that (2) the felony for which he was convicted involved the 'use or threat of violence to the person,' and that (3) the conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose."

*State v. Bishop*, 343 N.C. 518, 546, 472 S.E.2d 842, 857 (1996) (quoting *State v. Goodman*, 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979)), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 723 (1997). These requirements were met. We do not find defendant's arguments about frustrating California's legislative intent relevant. This assignment of error is overruled.

Defendant next raises several issues which he correctly notes we have decided contrary to his position, including: (1) that the trial court violated his constitutional rights by denying his motion to require the State to disclose aggravating circumstances; (2) that the trial court violated his due-process rights by preventing him from arguing to the jury about parole eligibility; (3) that the trial court erred in denying his motion to declare the death penalty unconstitutional; (4) that the trial court committed constitutional error by denying his motion to bifurcate the trial; (5) that the trial court's instructions allowing the jury to consider mitigating and aggravating circumstances in equipoise violated his constitutional rights; (6) that the trial court's definition of mitigating circumstances unconstitutionally limited the mitigating evidence the jury could consider; (7) that the trial court's instruction that all evidence in both phases of the trial was competent for sentencing allowed a death sentence to be returned based on nonstatutory aggravating circumstances; (8) that the trial court's instructions defining the burden of proof for mitigating circumstances were vague and erroneously allowed jurors to define the legal standard for themselves; (9) that the trial court's instruction allowed jurors to reject submitted mitigators because they had no mitigating value and thus violated his constitutional rights; and (10) that the trial court's instructions gave the jury discretion to reject proven mitigating circumstances and thus violated his constitutional rights. We have reviewed defendant's arguments, and we find no compelling reason to reconsider our prior holdings. These assignments of error are overruled.

STATE v. MURILLO

[349 N.C. 573 (1998)]

**[30]** Having found no error in defendant's trial or sentencing proceeding, we now review the record to determine: (1) whether the evidence supports the aggravating circumstance found by the jury; (2) whether the sentence was entered under the influence of passion, prejudice, or any other arbitrary consideration; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The jury found as an aggravating circumstance that defendant previously had been convicted of a felony involving the use of violence to the person. *See* N.C.G.S. § 15A-2000(e)(3). We conclude that evidence in the record fully supports the finding of this aggravating circumstance. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We therefore turn to our final statutory duty of proportionality review.

**[31]** One purpose of proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In proportionality review it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *See State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

This case is distinguishable from each of these cases. First, defendant here was convicted of murder on the basis of premeditation and deliberation. In three of the seven disproportionate cases— *Benson*, *Stokes*, and *Rogers*—the defendants were convicted solely on the basis of the felony murder rule. We have often emphasized that

"[a] conviction based on the theory of premeditation and deliberation indicates a more calculated and cold-blooded crime." *State v. Davis*, 340 N.C. 1, 31, 455 S.E.2d 627, 643, *cert. denied*, 516 U.S. 846, 133 L. Ed. 2d 83 (1995). Further, the jury found the (e)(3) statutory aggravating circumstance of prior conviction of a violent felony. None of the seven cases in which this Court found a sentence of death disproportionate included this aggravating circumstance. *See Harris*, 338 N.C. at 161, 449 S.E.2d at 387. Moreover, this Court has found the (e)(3) circumstance, standing alone, sufficient to sustain a sentence of death. *See State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995); *State v. Keel*, 337 N.C. 469, 447 S.E.2d 748; *see generally State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

Although defendant did seek medical attention for his victim, as did the defendant in *Bondurant,* we said in *Bondurant,* "we do not mean to imply that this factor is determinative of our proportionality consideration." *Bondurant,* 309 N.C. at 694 n.1, 309 S.E.2d at 183 n.1. Here, unlike in *Bondurant,* there was an expressed motive for the killing; defendant had said that if the victim left him, he would kill her, and evidence indicated that the parties were separated or separating. We also noted in *Bondurant* that there was no history of violence or animosity between the parties; here, by contrast, defendant had physically abused and threatened to kill the victim for years prior to actually killing her. Further, the victim was awakened in her home and killed. The sanctity of the home renders a murder there more deserving of the ultimate penalty. *See State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). We find the instant case distinguishable from each of the seven cases in which we have found the death penalty to be disproportionate.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all cases in the pool when engaging in proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude that the present case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate or those in which juries have consistently returned recommendations of life

imprisonment. Defendant correctly asserts that many cases of domestic violence ending in murder result in life sentences. Similarity of cases, however, is not the final word on proportionality; it "merely serves as an initial point of inquiry." *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *Id.* The jury here found eleven of twenty mitigating circumstances but notably rejected five indicating that the violence in the relationship was reciprocal. No member of the jury found any of the following submitted mitigators: Beth Murillo became aggressive while consuming alcohol and was consuming alcohol that night; Beth Murillo had previously threatened defendant; Beth Murillo had threatened defendant that night; Beth Murillo had previously assaulted defendant; Beth Murillo and defendant were engaged in an argument at the cabin prior to the time of the shooting. Additionally, the jury rejected the mitigating circumstance that defendant had a loving relationship with his first wife, Debbie, who also died by his hand.

In light of these factors, the prior violent felony resulting in another death, and the long history of defendant's abuse of the victim, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that the defendant received a fair trial and a fair capital sentencing proceeding, free from prejudicial error.

NO ERROR.